UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MARY JANE GLOWCZENSKI, and JEAN GRIFFIN,
Individually and as the Co-Administratrix of the Estate
of DAVID GLOWCZENSKI, **MEMORANDUM &**
                              Plaintiff(s), **ORDER**
                              CV04-4052(WDW)

          -against-

TASER INTERNATIONAL INC., VILLAGE OF SOUTHAMPTON,
SOUTHAMPTON VILLAGE POLICE DEPARTMENT,
POLICE OFFICER BRIAN PLATT in his individual and official capacity,
POLICE OFFICER MARLA DONOVAN, in her individual and official
capacity, POLICE OFFICER CHRIS WETTER, in his individual and
official capacity, POLICE OFFICER ARTHUR SCHUCHT, in his individual
and official capacity, COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPT., LIEUTENANT JACK FITZPATRICK, in his individual and
official capacity, LIEUTENANT HOWARD LEWIS, in his individual and
official capacity, JOHN DOES 1-10, who are known by name to the Defendants
but as of yet are not fully known to the Plaintiffs, OFFICE OF THE SUFFOLK
COUNTY MEDICAL EXAMINER, JAMES C. WILSON, M.D., Deputy Medical
Examiner, in his individual and official capacity, SOUTHAMPTON
VILLAGE VOLUNTEER AMBULANCE (a.k.a. SOUTHAMPTON
E.M.T. UNIT), MELISSA CROKE, EMT, in her individual and
official capacity, KEITH PHILLIPS, EMT, in his individual and official
capacity, TIM CAMPBELL, EMT, in his individual and official capacity, and
JAMES MOORE, Ambulance Driver, in his individual and official capacity,
                              Defendant(s).
-------------------------------------------------------------------X

**APPEARANCES**:

Rutherford & Christie, LLP
Lewis R. Silverman, Esq.
369 Lexington Avenue, 8th Floor
New York, New York 10017
Attorneys for Brian Platt

Devitt Spellman Barrett, LLP
Diane K. Farrell, Esq.
Jeltje deJong, Esq.
50 Route 11
Smithtown, NY 11787
Attorneys for Village and Police Defendants

Law Offices of Frederick K. Brewington
Frederick K. Brewington, Esq.
50 Clinton Street, Suite 501
Hempstead , NY 11550
Attorneys for Plaintiffs Mary Jane Glowczenski and Jean Griffin

**WALL, Magistrate Judge:**

Before the court is a motion for partial summary judgment by defendants Village of Southampton, Southampton Village Police Department, Police Officer Marla Donovan, Police Officer Christopher Wetter, Sgt. Arthur Schuct and Lt. Howard Lewis, in their individual and official capacities ("the Village defendants"). DE[103] & [105]. Also before the court is a motion for partial summary judgment by defendant Police Officer Brian Platt. DE[110] & [116]. The motions are opposed by the plaintiffs. DE[68], [136] & [135]. The parties have consented to my jurisdiction for all purposes.

For the reasons set forth herein, the motions are **GRANTED IN PART AND DENIED IN PART**, as follows:

(1) Summary judgment is granted on the false arrest claims;

(2) summary judgment is denied as to the negligence claims, with the proviso that no negligence claims based on intentional conduct or on the false arrest claim will go to the jury;

(3) summary judgment on the negligent failure to hire or train claim against the Police Department and the Village is denied;

(4) summary judgment on the *Monell* failure to train claim is denied;

(4) to the extent that Platt has moved for summary judgment on the claim of excessive force, the motion is denied.

## BACKGROUND

This lawsuit arises from the death of plaintiffs' decedent, David Glowczenski, on February 4, 2004. David Glowczenski was a 35 year old man with a history of schizophrenia, described by the plaintiffs as an "Emotionally Disturbed Person" ("EDP"). The plaintiffs are his mother, Mary Jane Glowczenski, and sister, Jean Griffin. Many of the following facts are taken from the exhibits provided by the Village defendants and are reported to set forth the documentary history of the Village Police with the Glowczenski family. The parties agree that most or all of the individual defendant officers were familiar with Glowczenski and his mental problems.

Glowczenski was in a psychiatric facility for the first time when he was 11 or 12 years old, and had been hospitalized at various institutions, including Pilgrim State Psychiatric Center, Kings Park Psychiatric Center, Stony Brook University Hospital, Eastern Long Island Hospital and the Lake Grove Treatment Center, over the years. *See* DE[68], Vill. Defs. Ex. D, 51:9-20; Vill. Defs. Ex. F, pp. 1, 92, 133-34. Mr. Glowczenski was no stranger to the Village Police prior to February 4, 2004. In 1994, complaints about Glowczenski were made to the police by Glowczenski's father, Theodore Glowczenski, in 1994 and 1995, and, in June 1994, the Village Police transported Glowczenski to Kings Park Hospital when the ambulance company refused to transport a patient deemed violent. Defs. Ex. H. Additional complaints by Glowczenski's father were filed in the summer of 1995. *See* Defs. Exs. I, J. In August 1995, Glowczenski was arrested for Criminal Mischief in the fourth degree after he threw a telephone at a wall and created a hole in the wall. Defs. Exs. J, K. On the same date, his father filed a complaint of harassment in the second degree, alleging that Glowczenski had threatened to kill him and burn

the house down.  Defs. Ex. K.

On September 29, 1995, Glowczenski was arrested for striking a police officer in the shoulder with his fist and resisting arrest by kicking the police officers.  Defs. Ex. N.  In connection with that incident, Glowczenski's doctor, Nicholas H. Pott, M.D. wrote a letter to the Southampton Town Court, stating that Glowczenski suffered from bipolar disorder, and that when he took his medication he was, for the most part, "rational and appropriate in his behavior." Defs. Ex. O.  He further reported that Glowczenski had discontinued his medication about six weeks prior to the incidents leading to his arrest.  The doctor reported that as of the date of the letter, October 24, 1995, Glowczenski was "clear in his mind that he must continue to take his medication, and in this state I do not see him as a threat to himself or to the public order."  *Id.*

The next indication of police involvement with the Glowczenskis that appears in the record was in April 2000, when Glowczenski's sister, the plaintiff Jean Griffin, complained that he was drunk and had threatened to kill her.  Defs. Ex. P.  On August 8, 2000, the police responded to a complaint that Glowczenski had telephoned a man named Mark Snyder and threatened to shoot Snyder and a woman named Gail.  Defs. Ex. Q.  On June 12, 2002, the police responded to a complaint by Glowczenski's brother, Teddy, that Glowczenski had pushed him. The report states that both brothers were drunk and Teddy chose not to press charges.  Defs. Ex. S.  On January 30, 2003, Mary Jane Glowczenski called the police and reported that Glowczenski had punched Teddy in the nose and had menaced her and Teddy with a hammer. Defs. Ex. S.  Teddy had allegedly hit Glowczenski in the head with a metal cane.  Mrs. Glowczenski further stated that Glowczenski had told her that if she called the police, he would kill her.  Both brothers were taken into custody.  *Id.*

Mary Jane Glowczenski testified at her deposition that following the incident in 2003, Glowczenski was given the option of going into a rehab program and he was admitted to the Lake Grove Treatment Center from February 2003 until September 2003. The treatment there included AA meetings. *See* Defs. Ex. D, 78-80. She further testified that Glowczenski had stopped taking his medication several days before the February 4, 2004 incident because he was afraid that the medication would cause him to develop diabetes. Defs. Ex. D, 82:1-83:17.

At approximately 9:00 a.m. on the morning of February 4, 2004, the Village Police Department received a 911 call from Mrs. Glowczenski saying that David Glowczenski was having a "psychotic episode," and was hearing voices. Defs. Ex. C. The transcript of the call reports Mrs. Glowczenski as saying that Glowczenski was "very psychotic" and that she "did not know if he [would] harm himself." *Id.* She reported that he "had been up all night and for about two or three days he's been getting worse." *Id.* She also reported that they were going to take him to the doctor that day, but "he just took off." *Id.* At her deposition, Mary Jane Glowczenski testified that she called the police because she feared that her son "might get victimized or something," and she wanted him in protective custody. Defs. Ex. D, 21:19-22:4. The police responded to the call at the Glowczenski home, but Glowczenski was not there when they arrived. Mary Jane Glowczenski testified that her son came home while the police were there, and that she told the police the family would handle the situation themselves. Defs. Ex. D. 92:11-16. The 911 records state that at 9:20 a.m., Mary Jane Glowczenski called and said Glowczenski had returned home, and that at 9:28 a.m., police officer 233 'advised that the subject is OK in residenc[e] and is seeking psychiatric help." Defs. Ex. C. Mary Jane Glowczenski called the police a third time, at about 10:30 a.m., saying that he had "fled again"

and was heading toward North Main St., still hearing voices and in an agitated state. *Id.*

Non-party witness Julie Bradshaw, a teacher at Our Lady of the Hamptons School in Southampton, was outside the school on the morning of February 4, and testified that she heard incoherent shouting and screaming. *See* Defs. Ex.DD. She saw a "pretty big man" who was "stumbling and yelling and screaming incoherently," and "looking crazed." *Id.* 19:3-23. She testified that he was close to the school, and that she was "scared." She further testified that she saw Officer Donovan and another officer and was relieved that they were there. The plaintiffs state that Ms. Bradshaw's reliability is in dispute. Pls. Mem. in Opp., DE[136] at 11.

The events from this point on are subject to dispute, and I turn now primarily to the plaintiffs' version of events, as I must on this motion for summary judgment. Where the defendants have come forward with evidence that varies from the plaintiffs' version, it will be noted.

On the morning of February 4, 2004, Defendant Police Officer Marla Donovan was outside of Our Lady of the Hamptons School. She testified that she had monitored the police radio and was aware of a call from the Glowczenski house that Glowczenski was hearing voices. Pls. Ex. JJ, 25:5-16[1]. She also stated that the dispatcher had sent out a message that Glowczenski had returned home. *Id.*, 27:8-10. She noted as well the third call, that Glowczenski had left the house again. At about 10:20, Donovan saw Glowczenski come out of some bushes in front of a residence. She turned on her police car lights and turned the car around. *Id.,* 29:11-31:7. She testified that at that time he was "screaming incoherently," and was holding a Bible and a Grateful Dead book. She called dispatch and said that she had located Glowczenski. She

---

[1]The plaintiffs' voluminous exhibits have been filed in hard copy, not electronically.

rolled down her window and asked him to "hold up." She reports that he then came over to the car and tried to open the door. She was afraid, and jumped out of the car. *Id.*, 33:12-34:14. Donovan and Glowczenski were standing on the sidewalk in front of the school when Defendant Police Officer Platt arrived in another police vehicle and began talking with Glowczenski. Platt told Glowczenski that his family wanted him to go to the doctor, and Glowczenski told Platt that he did not want to go. Pls. Ex. EE 122:2-9. While Platt was speaking with Glowczenski, Defendants Wetter and Schuct arrived at the scene.

Schuct testified that Glowczenski asked if he could go to his grandmother's house, but the officers told him he had to go to the hospital to get help. Pls. Ex. II, 23:8-24:14. Schuct testified further that Glowczenski then began to back away, and Schuct grabbed his left arm. *Id.* Glowczenski pulled away, turning his body, and came into contact with Donovan, who, at some point, fell to the ground. Schuct testified that after Glowczenski began to turn around, Schuct "grabbed the back of his shirt up by his collar with both my hands, and then with my left leg I swept both of his legs from left to right and put David on the ground." *Id.* 25:19-27:22. Glowczenski was on the ground face down. Schuct was lying catty-corner across Glowczenski's body. Schucht and Donovan tried to get Glowczenski's left arm out from under him. Schuct then told Platt, who was carrying a Taser, to "take the probes out and drive stun him." *Id.,* 29:17-32:11. Platt used the Taser on Glowczenski several times, with Schuct still lying on his body. The plaintiffs' expert report states that Glowczenski was shot "multiple times in rapid succession." Pls. Ex. DD, p. 6 ¶8. Donovan says the Taser was shot 2 or 3 times into Glowczenski's back. Pls. Ex. JJ, 55:5-56:16. Platt himself testified that "it may have been two [or] three times," but he "really didn't remember." Pls. Ex. EE, 153:21-154:17. In their

7

supplemental "Counter Statement of Material Facts in Dispute," the plaintiffs state that Glowczenski suffered "'18 electrical burns . . . evidencing al least 9 separate applications of Taser gun at extremely close range or probably by directly touching the body." DE[136-1] at 14, ¶13(citing to Pls. Exs. A & B, the Glowczenski autopsy report and photos; bolding in plaintiff's counterstatement omitted).

After Platt had used the Taser on Glowczenski, Defendant Office Wetter sprayed Glowczenski with pepper spray and Glowczenski was restrained with handcuffs behind his back and zip ties to his legs, still lying face down. *See* Pls. Ex. BBB, 45:9-22; 50:9-17; 57:21-58:12. The defendants state that they took these measures because Glowczenski continued to struggle violently, kicking and shouting. The plaintiffs say that the police themselves created the exigency of the situation and that the measures taken were unnecessary.

At some point, defendant Howard Lewis,[2] as well as non-party Detective Lamison arrived at the scene, and someone - perhaps Schuct - called for an ambulance. Wetter Dep. Tr., Pls. Ex. KK, 56:8-18. The events underlying the emergency medical assistance are set forth in the Order regarding the Ambulance/EMT defendants' motion for summary judgment and need not be repeated here. Those emergency efforts were unsuccessful, and David Glowczenski was pronounced dead at 11:20 a.m. The plaintiffs claim that Glowczenski's death was a homicide in police custody.

Based on these facts, the plaintiffs assert claims of false arrest, excessive force, violations

---

[2]Although the Village defendants have moved for summary judgment on behalf of all of the individual Village defendants, including Lt. Lewis, on the false arrest and negligence claims, the record before the court does not reflect that Lt. Lewis was involved in the alleged false arrest, having arrived after the fact.

of the Fourteenth Amendment, negligence, wrongful death and battery against the Village defendants, and claims of negligent hiring and supervision and failure to train against the municipality and the Police Department. *See* Amended Complaint, DE[9]. The Village defendants now move for partial summary judgment, seeking dismissal of the claims of false arrest and negligence, as well as dismissal of the claim of negligent hiring and supervision insofar as that claim alleges failure to train police officers in dealing with emotionally disturbed persons, and dismissal of the *Monell* failure to train claim against the Village and the Police Department. Officer Platt moves for partial summary judgment, seeking dismissal of the claims of false arrest, negligence and "constitutional claims." *See* DE[110], Platt Notice of Mtn. Inasmuch as Platt has incorporated the Village defendants' arguments into his papers in support, and there are few if any differences between the claims against the Village Police Officers and Officer Platt for the purposes of these motions, the two motions for summary judgment are herein addressed as one unless otherwise noted.

## DISCUSSION

### Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150

9

F.3d 132, 137 (2d Cir. 1998).  If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996).  The applicable substantive law determines which facts are critical and which are irrelevant.  *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'"  *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)).  The court "is not to weigh the evidence, but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty America v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir. 2007).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim."  *Jamaica Ash & Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322).  A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case.  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Marks v. New York Univ.,* 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

**False Arrest Claim**

False arrest claims are analyzed under the law of the state in which the arrest occurred, here, New York. *See Jaegly v. Couch,* 439 F.3d 149, 151-52 (2d Cir. 2006). The elements of false arrest in New York are (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the the confinement was not otherwise privileged. *See Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir. 2003). Under New York law, the existence of probable cause is an absolute defense to a false arrest claim. *Jaegly*, 439 F. 3d at 149.

Here, only the fourth element of the false arrest claim is at issue. New York Mental Hygiene Law Section 9.41 authorizes a police officer, when acting pursuant to his or her special duties, to take into custody any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to the person or others. The phrase "serious harm is likely to result is defined in the Mental Hygiene Law as "a substantial risk of physical harm to the person as manifested by threats or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself." N.Y. Ment. Hyg. Law §9.01. If applicable, section 9.41 would be a privilege that justified the police taking Glowczenski into custody.

To determine whether the defendants are entitled to the section 9.41 privilege, the court must determine whether the police defendants had probable cause to conclude that Glowczenski was acting a manner that invoked section 9.41. *See Kerman v. City of New York,* 261 F.3d 229, 240 n.8 (2d Cir. 2001). And, an objective reasonableness standard is applied to police behavior under section 9.41 as well as to claims under the Fourth Amendment. *Id.* Thus, before a person

can be seized and detained for psychiatric evaluation, an official must have probable cause to believe that the person is dangerous to himself or others. *See Bayne v. Provost,* 2005 WL 1871182, at *6 (N.D.N.Y. Aug. 4, 2005). "For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time." *Kerman,* 261 F.3d at 235 (citations omitted).

Here, the defendants argue that each of them was aware of Glowczenski's "long history of mental illness, violent behavior and substance abuse," and the possible ramifications of his ceasing to take his medication. DE[103-2] at 17. They knew from Mary Jane Glowczenski's phone calls and from speaking with her at her home on February 4, 2004 that Glowczenski had stopped his medication. Further, she reported that her son was having a "psychotic episode," and was hearing voices. Village Defs. Ex. C. As noted earlier, the transcript of the call reports Mrs. Glowczenski as saying that Glowczenski was "very psychotic" and that she "did not know if he [would] harm himself." *Id.* She reported that he "had been up all night and for about two or three days he's been getting worse." *Id.* She also reported that they were going to take him to the doctor that day, but "he just took off." *Id.* When Mary Jane Glowczenski called the third time on that day, she stated that her son had "fled again" and was heading toward North Main St., still hearing voices and in an agitated state. *Id.* The defendants state that all of the officers knew of these reports, and that even if some of them did not, the "collective or imputed knowledge doctrine" applicable to the determination of probable cause applies here, where there is no dispute that at least some of the officers did know about the reports. See DE[105] at 3 (citing *Zellner v. Summerlin,* 494 F.3d 344, 369 (2d Cir. 2007)). Under these circumstances, they argue, they had probable cause to believe that Glowczenski was mentally ill and was conducting himself

in a manner which demonstrated that he was dangerous to himself, and it was objectively reasonable for them to take Glowczenski into custody pursuant to Mental Hygiene Law section 9.41. *See* N.Y. Ment. Hyg. Law §9.01.

The plaintiffs argue that there are material issues of fact that preclude judgment on the false arrest claim. DE[136] 8-11. They say that the defendants were not aware of a history of violence or substance abuse, but even accepting that as true, there is no doubt that the officers were aware of Glowczenski's long history of mental illness and that they had interacted with him on numerous occasions. The plaintiffs further argue that on February 4, 2004, Glowczenski exhibited no signs of violence or indications that he was dangerous to others, and that he had committed no crimes. Taking those allegations as true, we are still left with the fact that the officers knew Glowczenski's history of mental illness and had ample reason to think that he might be a danger to himself. Indeed, his family expressed that very fear in their phone calls to the police, who had assisted in the past. The plaintiffs also argue that the defendants did not decide to take Glowczenski into custody at the scene, based on the circumstances before them, but that they had decided it earlier, when Glowczenski had committed no crime and "was not a danger to himself or anyone else." DE[136] at 10. They do not explain, however, why the officers should not have considered their long history with Glowczenski and his problems in planning a course of action on that day or why he was not a danger to himself.

Even giving the plaintiffs every inference to which they are entitled, and recognizing that issues of fact exist as to the level of violence, if any, exhibited by Glowczenski on that day, the record amply supports a finding that the defendants were objectively reasonable in deciding that Glowczenski was mentally ill and a danger to himself and thus had probable cause to confine

him in reliance on New York Mental Hygiene Law section 9.41.[3] The level of force used for that confinement is, of course, an entirely separate question that does not enter into the issue of probable cause for confinement and one that will be addressed at trial.

Finally, even if the defendants' actions here were not supported by probable cause, the fact that they were objectively reasonable under the circumstances would entitle them to a finding of qualified immunity. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on "the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). As noted, the officers were objectively reasonable in believing that their arrest of Glowczenski was justified under New York Mental Hygiene Law section 9.41. Thus, they are entitled to qualified immunity as an alternative basis on which to dismiss the plaintiffs' false arrest claim.

The claims against the defendants for false arrest, under both federal and state law, are dismissed.

**The Negligence Claims**

The plaintiffs assert negligence claims against the Police Officers, the Village and the Police Department defendants, as well as other defendants, in Counts 4 and 5 of the Amended Complaint. There are two "Fourth Count[s]" in the Amended Complaint. The first Fourth Count alleges violations of Section 1983 by various groups of defendants. The second Fourth Count alleges negligence on the part of the Police Officers, stating that they "had a duty not to shock,

---

[3]Indeed, if the police had let Mr. Glowczenski go free and he had been injured, they might have been subject to different claims by the family for failing to provide the protective intervention that they had offered in the past.

14

chemically spray, beat or otherwise abuse [Glowczenski] in such a way that would summarily cause his death," and a duty to not use excessive force or otherwise violate Glowczenski's constitutional and civil rights, and that they breached those duties. Amended Complaint, DE[9], ¶108. The Fifth Count alleges a duty on the part of all defendants to "properly investigate, act within the scope of their authority, and not to falsely arrest, falsely imprison, use excessive force or otherwise violate Glowczenski's Constitutional and civil rights, and they breached that duty." *Id.* ¶120.

To establish a prima facie case of negligence, a plaintiff must show: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) injury proximately resulting therefrom. *Solomon by Solomon v. City of New York,* 66 N.Y.2d 1026, 1027 (1985). If the plaintiff alleges intentional conduct in support of a claim for excessive force or battery, he may not also base a claim for negligence on that same conduct. *Morgan v. Nassau County,* 2009 WL 2882823, *19 (E.D.N.Y. Sept. 2, 2009). The defendants here argue that the negligence causes of action are based on alleged intentional conduct and must thus be dismissed[4]. New York, they argue, has adopted the view that once intentional offensive conduct is established, the actor is liable for assault and not negligence, even when the physical injuries were inflicted inadvertently. *Id.; see also Trott v. Merit Dept. Store,* 106 A.D.2d 158, 160 (1st Dept. 1985). And the Second Circuit has recognized the mutual exclusivity of negligence and battery, because "negligence is

---

[4]The defendants also argue that under New York law, when an arrestee is negligently injured as the result of his resisting arrest or attempting to escape from custody, public policy bars any recovery, and that the negligence claims should be dismissed on that ground. *See* DE[103-2] at 20 (citing *Farley v. Town of Hamburg,* 34 A.D.3d 1294 (4th Dept. 2006). Inasmuch as there are material issues of fact as to whether Glowczenski resisted arrest or attempted to escape, this ground has not been considered.

unintentional." *United National Insurance Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993).

The plaintiffs argue that their negligence claims are not founded upon the Officers' intentional conduct in taking Glowczenski into custody, but upon the breach of their duty to follow widely recognized law enforcement policies and procedures with respect to the handling of emotionally disturbed persons, prevention of positional asphyxia, the use of multiple, rapid succession application of TASER weapons, continuum of force, and restraint of sick or injured persons. DE[136] at 26-28. They further argue that if, for example, the jury found that the officers had been trained in handling emotionally disturbed people, they might also find that the officers negligently failed to apply that training.

The defendants are correct that to the extent that the negligence claims are duplicative of the false arrest, excessive force, or battery counts, or are based on intentional conduct, they should not (and will not) go to the jury. However, the court will not dismiss them outright, as there may be viable negligence claims at trial based on the jury's findings of fact.

**Failure to Hire and/or Train Claims:**

The Village and the Village Police Department defendants move for dismissal of the plaintiffs' "Monell claim insofar as Count III of the Amended Complaint Alleges a Failure to Train by the Village with Respect to the use of Force Against Mentally Ill Persons Including David Glowczenski ." DE[103-2] at 21, Point IV Heading. In Count Three, the plaintiffs claim that the Village and Police Department were "reckless, negligent or deliberately indifferent in their training, hiring and supervision of their police officers . . with respect to the use of force against mentally ill and other minority persons. . ." Amended Compl. DE[9], ¶88. A claim of inadequate training by a municipality will trigger liability when "the failure to train amounts to

16

deliberate indifference to the rights" of those with whom municipal employees come into contact. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 379 (1989). "Deliberate indifference" requires that the policy maker must have made a "deliberate choice . . . from among various alternatives not to fully train employees." *Id.* The Second Circuit has identified three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens. The plaintiff must show (1) that a policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult, or there is a history of employees mishandling the situation; and (3) that the wrong choice by the municipal employee will frequently cause the deprivation of a citizen's constitutional right. *See Walker v. City of New York,* 974 F.2d 293, 297 (2d Cir. 1992). At the summary judgment stage, a plaintiff must identify a specific deficiency in a municipality's training program and establish that the deficiency is closely related to the ultimate injury, such that it caused the constitutional violation. *Jenkins v. City of New York,* 478 F.3d 76, 94 (2d Cir. 2007) (citing *Green v. City of New York,* 465 F.3d 65, 81 (2d Cir. 2006)).

The defendants argue that their long history with Glowczenski prior to February 4, 2004 demonstrates that they dealt with him effectively and that the Glowczenski family expressed its confidence in the ability of the police officers to handle Glowczenski. This, they argue, establishes as a matter of law that the Village did not exhibit deliberate indifference by failing to train its officers in the use of force to be used with an emotionally disturbed person like Glowczenski and that the incident on February 4 was an isolated event insufficient to raise a genuine issue of fact as to deliberate indifference. DE[103-2] at 22-23. The fact that no

problems arose prior to February 4, 2004 does not, however, address the question of adequate training and there is a material issue of fact as to what training, if any, most of the defendants received in regard to dealing with mentally ill citizens, including the use of force.

The plaintiffs argue that the history of contact with Glowczenski establishes that the Village knew to "a moral certainty" that contact with mentally ill people would (and did) arise, that the situation created difficult choices that training could have made less difficult, and that the wrong choice by an untrained employee would frequently result in a deprivation of constitutional rights[5]. The plaintiffs have raised issues of material fact as to how "a hypothetically well-trained officer would have acted under the circumstances" and whether excessive force occurred as a result of training deficiencies. *See Amnesty America,* 361 F.3d at 130-31(quoting *City of Canton*, 489 U.S. at 391).

The defendants argue that, whatever questions might exist in regard to EDP/excessive force training, no inference can be drawn from circumstantial proof of a single incident. DE[105] at 9 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808 (1985)). The plaintiffs argue that a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability. DE[136] at 21 (citing *Amnesty America,* 361 F.3d at 126). *Amnesty America* sets forth the proposition that "a single action taken by a municipality is sufficient to expose it to liability," but is not clear whether the court intended to hold that a failure to train could be considered a "single action" for municipal liability purposes. Nonetheless, the Second Circuit

---

[5]They support their argument with reference to a report by Edward Mamet of ECJM Consultants, an expert for the plaintiffs. Mr. Mamet's report is, however, unsworn and inadmissible on this motion and will not be considered for the reasons set forth in the order denying the Taser defendants' motion.

also explained that where a "city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them," there may be municipal liability. 361 F.3d at 125. Here, the plaintiffs have raised issues of material fact and/or sufficient inferences to withstand summary judgment on this issue.

**Additional Constitutional Claims**

Neither the Village Defendants nor Officer Platt moved for summary judgment on the excessive force claim, although in his Notice of Motion Platt refers to vague "constitutional claims." See DE[110]. Nonetheless, in their memoranda of law in opposition to the motions, the plaintiffs included lengthy argument as to why the excessive force claim should not be dismissed. In his reply memorandum, Platt then argued that any excessive force claim pursuant to the fourteenth amendment, as opposed to the fourth amendment, should be dismissed. DE[116] at 1-2. While that may well be true, the court will not now consider the argument, because it was raised in a reply brief and not on the original motion. The excessive force claim will go to the jury, and the question of which constitutional amendment such a claim must be considered under can be determined at a later date.

Dated: Central Islip, New York  
      May 13, 2010

SO ORDERED:

/s/ William D. Wall  
WILLIAM D. WALL  
United States Magistrate Judge