UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MARY JANE GLOWCZENSKI and JEAN GRIFFIN,
Individually and as the Co-Administratrix
of the Estate of DAVID GLOWCZENSKI,

DOCKET NO.: CV-04-4053
(WDW)

Plaintiffs,

-against-

VILLAGE OF SOUTHAMPTON, SOUTHAMPTON
VILLAGE POLICE DEPARTMENT, POLICE OFFICER
Brian Platt, in his individual and official
capacity POLICE OFFICER Marla Donovan,
in her individual and official
capacity, POLICE OFFICER Chris Wetter,
in his individual and official capacity,
POLICE OFFICER Arthur Schucht, in his
individual and official capacity, COUNTY OF SUFFOLK,
SUFFOLK COUNTY POLICE DEPARTMENT,
LIEUTENANT Jack Fitzpatrick, in his individual and
official capacity, LIEUTENANT Howard Lewis, in his
individual and official capacity, John Doe 1-10,who are
known by name to the Defendants but as of yet are not
fully known to the Plaintiffs, OFFICE OF THE SUFFOLK
COUNTY MEDICAL EXAMINER, James C. Wilson, M.D.,
Deputy Medical Examiner, in his individual and official
capacity, SOUTHAMPTON VILLAGE VOLUNTEER
AMBULANCE, Melissa Croke, EMT, in her individual and
official capacity, Keith Phillips, EMT, in his individual and
official capacity, Tim Campbell, EMT, in his individual and
official capacity, and James Moore, Ambulance Driver, in his
individual and official capacity

Defendants.
-----------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANTS' VILLAGE OF SOUTHAMPTON, SOUTHAMPTON VILLAGE POLICE DEPARTMENT, POLICE OFFICER MARLA DONOVAN, POLICE OFFICER CHRIST WETTER, POLICE OFFICER ARTHUR SCHUCT, AND LIEUTENANT HOWARD LEWIS *DAUBERT* MOTION

LAW OFFICES OF
FREDERICK K. BREWINGTON
*Attorneys for Plaintiff*
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959

*OF COUNSEL:   FREDERICK K. BREWINGTON*

# TABLE OF CONTENTS

PAGE NO.

TABLE OF CASES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STANDARD FOR ADMISSION OF EXPERT TESTIMONY  . . . . . . . . . . . . . . . . . . . . . 9

POINT I.

     MR. EDWARD MAMET AND DR. THANNING ARE QUALIFIED AS
     EXPERTS FOR THE PURPOSES RAISED IN THEIR RESPECTIVE
     EXPERT REPORTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     A.    Mr. Mamet is Qualified As an Expert for the Purposes of Law
          Enforcement Training, Practices and Policies Regarding Positional Asphyxia
          and Restraint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     B.    Dr. Thanning is Qualified As an Expert for the Purposes of Providing Expert
          Medical Opinions Regarding the Medical Evidence Supporting Excessive
          Force Used by Defendants and the Mechanisms attributed to the cause of
          Death Including Positional Asphyxia and Pepper Spray  . . . . . . . . . . . . . . . 13

POINT II

     MR. MAMET'S AND DR. THANNING'S EXPERT TESTIMONY IS
     ADMISSIBLE AS IT IS BASED ON RELIABLE DATA, PROFESSIONAL
     EXPERIENCE, SPECIALIZED KNOWLEDGE AND SOUND
     METHODOLOGY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.    Mr. Mamet's Testimony is Admissible as it is Based on in Excess of
          Forty Years of Practical Experience, Law Enforcement Education,
          Training of Police Officers and Writing of Law Enforcement Policies,
          Practices and Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          i.    Mr. Mamet's Expert Testimony Regarding Positional Asphyxia
               is Admissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      ii.     **Mr. Mamet's Expert Testimony That Restraints Compromised Resuscitation Efforts is Admissible** .............. 21

B.     **Dr. Thanning's Testimony is Admissible as it is Based on Decades of Experience as a Forensic Pathologist, Specialized Medical Education, Academic Research and Practical Experience** ........................................... 24

      i)     **Dr. Thanning's Opinion Regarding Evidence of Excessive Application of Force to Decedent is Admissible** ............................ 25

      ii)     **Dr. Thanning's Expert Testimony Regarding Positional Asphyxia is Admissible** ................................................ 29

      iii)     **Dr. Thanning's Expert Testimony Regarding Positional Asphyxia is Admissible.** ................................................ 33

**POINT III.**

     **MR. MAMET'S AND DR. THANNING'S TESTIMONY IS RELEVANT TO AID THE JURY IN UNDERSTANDING THE MECHANISMS THAT CONTRIBUTED TO DAVID Glowczenski'S DEATH AND THE INSUFFICIENT TRAINING AND INAPPROPRIATE CONDUCT OF DEFENDANT SVPD POLICE OFFICERS THAT CULMINATED IN DAVID GLOWCZENSKI'S DEATH** ........................................... 36

A.     **Mr. Mamet's Testimony is Relevant to Educate the Jury Regarding Long Held Law Enforcement Policies, Practices and Training Issues Central to the Circumstances That Resulted in the Death of David Glowczenski** ........ 37

B.     **Dr. Thanning's Testimony is Relevant to Educate the Jury Regarding the Mechanisms that Contributed to David Glowczenski's Death and the Medical Evidence in Support thereof in Terms of Injuries Sustained by the Decedent and said Injuries Relation to Causation of Death** .......................... 38

**CONCLUSION** ........................................................ 39

# TABLE OF CASES

## FEDERAL CASES

**CASE NAME**                                                                    **PAGE NO.**

Amorgianos v. Amtrak,
303 F.3d 256 (2d Cir. N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Arista Records LLC v. Usenet.com, Inc.,
608 F. Supp. 2d 409 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Borawick v. Shay,
68 F.3d 597 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23

Colon ex rel. Molina v. BIC USA, Inc.,
199 F. Supp. 2d 53 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Daubert v. Merrell Dow Pharm., Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 36

Donnelly v. Ford Motor Co.,
80 F. Supp. 2d 45 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Figueroa v. Boston Scientific Corp.,
254 F. Supp. 2d 361 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Glowczenski v. TASER International,
2010 U.S. Dist. LEXIS 47127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Heston v. City of Salinas,
Doc. No. 05-3658 (N.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Joint E. & S. Dist. Asbestos Litig.,
52 F.3d 1124(2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

In re Paoli R.R. Yard PCB Litig.,
35 F.3d 717(3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

In re Zyprexa Prods. Liab. Litig.,
489 F. Supp. 2d 230(E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23, 37

Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ. 7369
 2006 U.S. Dist. LEXIS 51869, 2006 WL 2128785(S.D.N.Y. July 28, 2006) . . . . . . . . . . . . 10

Kumho Tire Co. v. Carmichael,
526 U.S. 137(1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lidle v. Cirrus Design Corp.,
2010 U.S. Dist. LEXIS 67031(S.D.N.Y. July 6, 2010) . . . . . . . . . . . . . . . . . . . 9, 21, 27, 33, 36

Marbled Murrelet v. Babbitt
83 F.3d 1060 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Nimely v. City of New York,
414 F.3d 381(2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Raskin v. Wyatt Co.
125 F.3d 55 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27, 33

Robinson v. Sanctuary Record Groups, Ltd.,
542 F. Supp. 2d 284 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Stagl v. Delta Air Lines, Inc.,
117 F.3d 76 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Tin Yat Chin,
371 F.3d 31 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Duncan,
42 F.3d 97 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,
571 F.3d 206 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## STATUTES

Federal Rule of Evidence 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *PASSIM*

## PRELIMINARY STATEMENT

Plaintiffs contend that Defendants Southampton Village Police Department (herein "SVPD"), Police Officer Marla Donovan, Police Officer Chris Wetter, Police Officer Arthur Schucht, Lieutenant Howard Lewis (herein "SVPD Defendants") motion to exclude Dr. Lone Thanning's (herein "Dr. Thanning") expert report, opinions and testimony regarding 1) extensive evidence of excessive application of force used by SVPD Defendants against Decedent; 2) an associated condition of the mechanism of death was positional asphyxia; and 3) an associated condition to the immediate cause of death was pepper spray exposure.  SVPD Defendants also move to exclude Mr. Edward Mamet's expert opinions that: 1) Defendant SVPD's failure to train its officers regarding positional asphyxia was a direct cause of Decedent's injuries and death; and 2) SVPD Defendants failed to allow adequate resuscitation efforts of Decedent by refusing to remove the restraints upon observing that David Glowczenski was not breathing and was in cardiac arrest.  Co-Defendants TASER International and Police Officer Platt joined in SVPD Defendants' motion to preclude Dr. Thanning's and Mr. Mamet's expert testimony, as such, the instant response serves as a response to each of those Defendants' and co-Defendants' request to exclude Dr. Thanning's and Mr. Mamet's testimony as discussed *infra*.

Dr. Thanning's expert testimony is both admissible and relevant to the death of the Decedent, Mr. David Glowczenski.  Dr. Thanning's expert opinions are based on her vast experience as a forensic pathologist.  Defendants state that positional asphyxia is a theory that has been throughly "debunked" is simply untrue.  At the most, it is a situation that law enforcement continue to be instructed to avoid and is well recognized as a situation to avoid.  There is a vast number of peer reviewed articles that continue to caution against positional asphyxia and at most, there is a dispute amongst some experts as to whether positional asphyxia should be recognized.  However, the

prevailing medical and law enforcement experts recognize and warn against positional asphyxia. It should also be noted that Dr. Wetli and Dr. DiMiao are two of TASER International's paid experts who are proponents of the medically unaccepted questionable phenomenon of "excited delirium" and that the attempts to "debunk" positional asphyxia are in relation at an attempt to promote "excited delirium." (*See* Discussion POINT II B(ii) *Infra.*).  As there are facts in dispute between experts regarding the long recognized issue of positional asphyxia, it is for a jury to decide whether positional asphyxia was a mechanism of death.  (*Id.*).  Furthermore, numerous courts and juries have found positional asphyxia to be the cause of death regarding in-custody deaths.

Similarly, Mr. Mamet's expert testimony is both admissible and relevant to issues of law enforcement practices, policies, training and procedures regarding positional asphyxia arrest procedure and the removal of restraints during resuscitation. (*See* Discussion POINT II and II *Infra*).

As such, Dr. Thanning's and Mr. Mamet's expert testimony are admissible, reliable and relevant to determining the aforementioned issues regarding the conduct of SVPD Defendants that culminated in the wrongful death of the David Glowczenski, and the contribution of the use of the Taser weapon.  As such, SVPD Defendants' and TASER's motion to exclude the testimony of Dr. Thanning and Mr. Mamet must be denied.

## STATEMENT OF FACTS

### A. Procedural History

The underlying facts are set forth in the orders of the Honorable Magistrate Judge William D. Wall in the three decisions disposing of Defendants' respective Fed. Rule 56 motions for summary judgment.  The decisions appear on the Court's electronic docket [herein "DE"]:

1.  DE 140, granting in part and denying in part Defendants SVPD and Police Officer

2

Brian Platt's motion for summary judgment (DE 103),

2.   DE 141, granting Defendant Ambulance Company's motion for summary judgment in its entirety (DE 107), and

3.   DE 142, denying Defendant TASER's motion for summary judgment in its entirety. (DE 117).

## B.  Factual Background

On February 4, 2004 Plaintiff Mary Jane Glowczenski (herein "Mrs. Glowczenski") called Defendant Southampton Village Police (here in "Defendant Police Department") three times: 1) to report that her son David Glowczenski (here in "Decedent") had fled the residence; 2) to advise Defendant Southampton Police that Decedent had returned home; and 3) to report that Decedent had again fled the residence and that the family would take care of transporting Decedent to the hospital. (Brewington Decl. **Exh. C**, M.J. Glowczenski Depo., p. 22: 5-15, 31: 4 to 32:7; **Exh. Z**).   On previous occasions the Glowczenski family had handled getting Decedent to a doctor or hospital after police had assisted the family in locating him.  (Brewington Decl. **Exh. C**, M.J. Glowczenski Depo., p. 33: 25 to 34:12).

On February 4, 2004, Decedent was not violent and had not threatened his family. (Brewington Decl. **Exh. C**, M.J. Glowczenski Depo., p. 97:5-8, 102:13-20; ).  Mrs. Glowczenski called the Defendant Police Department because she was worried that her son, Decedent, might be victimized. (Brewington Decl. **Exh. C**, M.J. Glowczenski Depo. p. 21:15 to 22:15).  Decedent was well known in the community and often helpful with his neighbors with whom he maintained normal neighborly relationships. (**Exh. AA**, p. 22 ln 25 to 23 ln 23).  Unfortunately, the Glowczenski family has been impacted by the father, Theodore Glowczenski's long history of alcoholism and violent tendencies.  (Brewington Decl. **Exh. C**, M.J. Glowczenski Depo., p. 158:5 to 159:5, 159:21 to

3

160:5).  In attempting to cast Decedent as a violent man, Defendants misplace their reliance upon

the Glowczenski family's pattern of calling the police for trivial incidents, such as when Decedent's

sister, Jean Griffin, called the police and filed for a restraining order to spite Decedent for cursing

in front of her child. (Brewington Decl. **Exh. I**, Griffin Depo, p. 55:22-24, 58:7-8, 63:3-6).  When

the Glowczenski family did call police regarding Decedent's mental illness, it was to gain access to

mental health resources. (Brewington Decl. **Exh. I**, Griffin Depo,, p. 22:20 to 23:9).

Notably, the precipitating factor for the domestic disturbances in the Glowczenski home was

alcoholism.  For example, in January 2003, Decedent and his brother Teddy Glowczenski were

arrested after the police were called when Teddy and David, who were both intoxicated, got into an

altercation at the Glowczenski residence. (Brewington Decl. **Exh. BB**, p. 40 ln 23 to 41 ln 13; &,

**Exh. I**, Griffin Depo, p. 69: 6-10).  Decedent sought treatment for alcohol use at the Lake Grove

Treatment Center.  (Brewington Decl. **Exh. I**, Griffin Depo, p. 69:11-22).  Decedent was considered

to have conducted himself as a gentleman while residing at the Lake Grove Treatment Center, and

because he was doing so well, was released early. (Brewington Decl. **Exh. C**, M.J. Glowczenski

Depo., p. 80:17-20, 121:15 to 120: 3).  Decedent remained sober from approximately September

2003 until his death on February 4, 2004. (Brewington Decl. **Exh. C**, M.J. Glowczenski Depo., p.

122 :10-13, 166: 2-10; **Exh. U**, Wilson Depo., p.103:24 to 104:17). In fact, Decedent's sister, Jean

Griffin, had Decedent babysit her children.  (Brewington Decl. **Exh. I**, Griffin Depo, p. 70:15-18).

The Defendant Officers were each familiar with Decedent. (Brewington Decl. **Exh. K**, p.5

¶1).  On February 4, 2004, Officer Marla Donovan was assigned to present a D.A.R.E. class at Our

Lady of the Hamptons Regional Catholic School. (Brewington Decl. **Exh. V**, Donovan Depo., p.

23:6-12).  Upon seeing Decedent, Officer Donovan activated her flashing patrol car lights, and

4

stopped four feet from Decedent. (Brewington Decl. **Exh. V**, Donovan Depo., p. 30:17 to 31:9, 33:3-17).  Officer Donovan rolled down her window and called Decedent over to the car. (Brewington Decl. **Exh. V**, Donovan Depo., p. 33:10 to 34:9).  Officer Donovan, who lacked training for dealing with Emotionally Disturbed Persons (here in "EDP") jumped out of the car because she was afraid of Decedent when he approached the car.  (Brewington Decl. **Exh. V**, Donovan Depo., p. 34:15-25).  After exiting her vehicle, Decedent followed Officer Donovan onto the sidewalk in front of the school where they were standing when Officer Brian Platt arrived. (Brewington Decl. **Exh. V**, Donovan Depo., p. 35:1-8, 38: 17-20; **Exh. X**, Platt Depo., p. 108: 9-13).  Officer Platt approached Officer Donovan and Decedent on the sidewalk. (Brewington Decl. **Exh. V**, Donovan Depo., p. 38: 24 to 39:11).  After Officer Platt informed Decedent he had to go to a doctor,  Decedent indicated that he did not want to go.  (Brewington Decl. **Exh. X**, Platt Depo., p. 121:20 to 122: 9).   At that time Decedent had not committed any crime, was not subject to arrest and should have been free to walk away. (Brewington Decl. **Exh. X**, Platt Depo., p. 122:7-19).  While Officer Platt was speaking to Decedent, Officers Christopher Wetter and Arthur Schucht arrived at the scene. (Brewington Decl. **Exh. V**, Donovan Depo., p. 40:3-8).

Defendant Officers Donovan, Platt, Wetter and Schucht did not have any formal training in taking EDPs into custody. (Brewington Decl. **Exh. K,**, p. 6 ¶13; **Exh. V**, Donovan Depo., p. 18:12-19; **Exh. X**, Platt Depo., p. 79:25 to 80:7; **Exh. W**, Wetter Depo., p. 9:1-19; **Exh. N**, Schucht Depo., p. 12:5-9; **Exh. Y**, Lewis Depo., p. 14:19 to 15:6).   During an episode of psychological and emotional distress, Defendants Donovan, Wetter, Platt and Schucht approached and surrounded Decedent. (Brewington Decl. **Exh. K**, p. 5 ¶3).  Decedent's requests that he be allowed to proceed to his grandmother's house were denied by the Defendant Police Officers.  (Brewington Decl. **Exh.**

5

N, Schucht Depo., p. 23:6 to 24:13). In the past, Glowczenski had been transported to Pilgrim State Psychiatric Hospital unrestrained. (Brewington Decl. **Exh. W**, Wetter Depo., p. 29:24 to 30:2).

Officer Schucht initiated physical contact by grabbing Decedent's arm. (Brewington Decl. **Exh. N**, Schucht Depo., p. 25:16 to 26:14). Officer Schucht then grabbed Decedent by the back of his shirt collar with both hands and kicked Decedent to the ground. (Brewington Decl. **Exh. N**, Schucht Depo., p. 27:15-22). Officer Schucht, is 6'2" tall and 270 pounds, was on top of Decedent's back from the time Decedent was knocked to the ground. (Brewington Decl. **Exh. K**, p. 6 ¶10; & **Exh. N**, Schucht Depo., p. 28:6 to 29:8, 44:24 to 45:3). Officer Schucht ordered Officer Platt to use a TASER in drive stun mode without further instruction.   (Brewington Decl. **Exh. K**, p. 6 ¶7; & **Exh. X**, Platt Depo., p. 147:4-11). Officer Platt shot Decedent with the TASER M26 at least nine times in rapid succession. (Brewington Decl. **Exh. K**, p. 6 ¶8). Officer Wetter sprayed Decedent with OC spray (here in "pepper spray") after Decedent was shot with the TASER. (Brewington Decl. **Exh. K**, p. 6 ¶9; & **Exh. CC**).

Decedent was restrained with handcuffs behind his back and zip ties to his legs. (Brewington Decl. **Exh. K**, p. 6 ¶11). Defendant Officers left Decedent lying face down on the ground until the Decedent stopped breathing. (Brewington Decl. **Exh. K**, p. 6 ¶6). Although Defendant Officers had called for assistance from a crisis intervention team in the past, on February 4, 2004, Defendant Officers failed to make any attempt to request assistance from either a crisis intervention team or any psychological professional. (Brewington Decl. **Exh. K**, p. 5 ¶4; & **Exh. W**, Wetter Depo., p.11:22 to 12:11).

Defendants offer many facts within their memorandum of law, which are genuine issue of material fact in dispute, including but not limited to:

6

1.      The number of times Decedent was shot with the TASER M26:

2.      Sgt. Schucht's positioning on top of Decedent;

3.      How combatant Decedent was, if at all and if so, when did Decedent cease;

4.      The timing regarding when Decedent actually became unresponsive; and

5.      How Decedent obtained the contusions to his head.

All of these issues of disputed facts have been addressed in the Rule 56 Summary Judgment Motions and accompanying Local Rule 56.1 Statements of Fact and Counter-Statements of Fact. All disputed facts are the province of the jury and not to be decided as a matter of law. All aforementioned are genuine issues of material fact, which have a direct impact on the direct and contributor mechanisms of death that caused David Glowczenski's death. (Discussed *Infra*.).

### C.      Collusion between Co-Defendant TASER International and Defendants Regarding David Glowczenski's Autopsy by Co-Defendant Dr. Wilson

Defendants offer Dr. Wetli's expert opinion regarding positional asphyxia, who was the Chief medical Examiner for Suffolk County at the time of David Glowczenski's autopsy that was performed by Dr. Wetli's subordinate, Dr. James Wilson (herein "Dr. Wilson"). (Brewington Decl., **Exh. T**, Wetli Expert Report and Curriculum Vitae (March 29, 2009), C.V., p. 4). Dr. Wetli has been retained by TASER International directly in at least five or six cases and in a number of other cases by a municipality where TASER International was a co-Defendant. (Brewington Decl. **Exh. KK**, Wetli Depo., p. 18:22 to 24:16). For example, that Dr. Wetli is one of TASER International's paid experts, including for the causation of death in Heston v. City of Salinas, Doc. No. 05-3658 (N.D. Cal.), in which the jury found the use of prolonged and/or continuous exposure to a TASER weapon a contributory factor to the death of Mr. Heston. (Brewington Decl. **Exh. DD**; **Exh. EE**).

7

It should be noted though Defendants object to Dr. Thanning's testimony because she did not perform the autopsy on Mr. Glowczenski, Dr. Wetli did not perform an autopsy on Mr. Heston, but like Dr. Thanning in the David Glowczenski case, based his testimony regarding cause of death on a pre-existing autopsy and other documentation. (Brewington Decl. **Exh. DD**). Likewise, Dr. Wetli, to the best of Plaintiffs' knowledge did not conduct the autopsy in this case either.

Dr. Welti, had authored or co-authored articles on "excited delirium" while he was at the University of Miami Florida, the same institution as Defendant TASER's main expert on "excited delirium," Dr. Marsh. (Brewington Decl. **Exh. U**, Wilson Dep., p. 35:23 to 37:6, 47:14-24). Dr. Wilson had never prepared tissue slides for an autopsy of a decedent's brain tissue until David Glowczenski's case where Dr. Wilson was instructed by Dr. Welti to send the slide of decedent's brain matter to Dr. Marsh. (Brewington Decl. **Exh. U**, Wilson Depo., p. 35:23 to 37:6). Dr. Wilson never heard of "exhaustive mania" until he received the report on David Glowczenski's brain tissue sample from Dr. Marsh and had never learned about "exhaustive mania" in medical school, during his training as a pathologist or during postgraduate studies. (Brewington Decl. **Exh. U**, Wilson Dep., p. 49:6 to 51:7). Dr. Wilson could not explain what certain terms in Dr. Marsh's report meant, did not have a clear knowledge of the methodology used and was unable to explain the process of how Dr. Marsh came to her conclusions. (Brewington Decl. **Exh. U**, Wilson Dep., p. 77:4 to 85:11). Yet, Dr. Wilson blindly adopted same, and found David Glowczenski's cause of death to be "exhaustive mania" based on Dr. Marsh's report, Decedents mental illness and the alleged fact Decedent was resisting attempts by the police officer to subdue him. (Brewington Decl. **Exh. U**, Wilson Dep., p. 86:22 to 88:5). Dr. Wilson reviewed his autopsy findings for Decedent with Dr. Welti prior to signing the autopsy report. (Brewington Decl. **Exh. U**, Wilson Dep., p. 128:4-9).

8

Additionally, Dr. Wilson had a meeting with representatives from co-Defendant TASER International specifically about Decedent's death, before he completed the autopsy report on David Glowczenski. (Brewington Decl. **Exh. U**, Wilson Dep., p. 46:21 to 47:13).  As such, co-Defendant TASER had the unprecedented access and opportunity to influence Dr. Wilson's autopsy findings regarding David Glowczenski, both directly and indirectly through Dr. Wetli.  Furthermore, Dr. Wetli has never found a TASER International weapon to be the cause or contributing cause of death in any autopsy he has performed or in **any** case that he has provided expert testimony and does not believe that TASER can cause death, outside of a person falling from a great height.  (Brewington Decl. **Exh.** KK, Wetli Depo. 22:2 to 24:16).  Dr. Wilson's autopsy was not performed independent of influence from Defendant TASER and, as such, Dr. Wilson's findings must be viewed in a similar light as if he were one of Defendant TASER's paid experts.

## ARGUMENT

### STANDARD FOR ADMISSION OF EXPERT TESTIMONY

" Before permitting a person to testify as an "expert" under Rule 702, a district court must make the following determinations: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." Lidle v. Cirrus Design Corp., 2010 U.S. Dist. LEXIS 67031, *7 (S.D.N.Y. July 6, 2010); *See also* Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005).

### I.   MR. EDWARD MAMET AND DR. THANNING ARE QUALIFIED AS EXPERTS FOR THE PURPOSES RAISED IN THEIR RESPECTIVE EXPERT REPORTS.

"To determine whether a witness qualifies as an expert, courts compare the area in which the

9

witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). In the Second Circuit, most courts "have liberally construed expert qualification requirements when determining whether a witness can be considered an expert." Robinson v. Sanctuary Record Groups, Ltd., 542 F. Supp. 2d 284, 289 (S.D.N.Y. 2008) (internal citation omitted).

Based on this liberal qualification standard, a trial court "must consider the totality of a witness's background when evaluating the witness's qualifications to testify as an expert." Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009)(internal citation omitted). An expert "should not be required to satisfy an overly narrow test of his own qualifications." Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ. 7369, 2006 U.S. Dist. LEXIS 51869, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006)(internal citation omitted). On the contrary, "[i]n considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." Id. (internal citation omitted). Accordingly, while it is not the case here, "one may be an expert solely based on one's practical experience notwithstanding a lack of professional education or one's formal education despite a lack of practical experience." Id. Lidle, 2010 U.S. Dist. LEXIS 67031, *8-9.

A.    **Mr. Mamet is Qualified As an Expert for the Purposes of Law Enforcement Training, Practices and Policies Regarding Positional Asphyxia and Restraint.**

Defendant grossly mis-characterizes Mr. Mamet's level of expertise regarding law enforcement by stating in "the basis of Mr. Mamet's expertise is the experience he gained as a

member of the New York City Police Department (herein "NPD"). He first became Sergeant in 1969, and retired from the force in 1998." (Def. Mo. to Prec. Expert Test., Doc. No. 04 CV 4052 (WDW), p.5). Defendant willfully ignores the extensive law enforcement experience Mr. Mamet had outside of his duties with the NPD and attempts to truncate Mr. Mamet's career by failing to mention that Mr. Mamet worked in a variety of positions within the NPD from 1959 through 1998, almost forty years, and that from March 24, 1984 to the date of his retirement in 1998, Mr. Mamet was a Police Captain. ( Brewington Decl. **Exh. K**, Resume and Expert Report of Edward Mamet, CPP, CFE (March 2009). Mr. Mamet has in excess of forty years in law enforcement and has been the president of Police Practices & Management Consultant from January 1999 to the present. (Brewington Decl. **Exh. K**).

Specifically, Mr. Mamet's professional designations, past and present include significant involvement in law enforcement policy making and accreditation on a national, state and local level:

1. Peer Reviewer : National Institute of Justice (Office of Research and Evaluation);
2. Consultant: US Department of State (International Visitor Leadership Program);
3. Administrative Study Consultant and Assessor, New York State Division of Criminal Justice Services (Law Enforcement Accreditation Program);
4. Instructor: New York State Division of Criminal Justice Services (Security Guard Program);
5. Assessor: Commission On Accreditation for Law Enforcement Agencies Inc. (Law Enforcement Accreditation Program);
6. Police Procedures Consultant: U.S. Department of Justice (Civil Rights Division Police Misconduct Initiative and the Office of Justice Programs);
7. Investigations Consultant: NPD (Detective Bureau Case Management System); and
8. Society of Industrial Leaders: Standard & Poor's (Law Enforcement and Security Panel).

(Brewington Decl. **Exh. K**, p.3). Furthermore, Mr. Mamet's membership in professional organizations has not been not limited to the International Association of Chiefs of Police, as implied in Defendant's motion to exclude Mr. Mamet's expert opinion, as evidenced by his membership in:

11

1) Police Executive Research Forum; 2) International Law Enforcement Educators & Trainers Association; 3) American Academy of Professional Law Enforcement; 4) Americans for Effective Law Enforcement; 5) Association for Former Intelligence Officers; 6) American College for Forensic Examiners, Inc.; 7) Association of Certified Fraud Examiners; and 8) American Society for Industrial Security.  (Brewington Decl. **Exh. K**, p. 4)  As such, Defendant's contention that Mr. Mamet's expertise is isolated to the practices and policies of the NPD is absolutely unfounded and false. Furthermore, Defendant has failed to demonstrate that Mr. Mamet's practical and professional experience alone is an inadequate basis for his expert opinions regarding law enforcement.

From 2006 through 2008, Mr. Mamet has provided expert testimony is approximately fifteen cases, with six appearances at trial and the remainder as deposition testimony. He has qualified as an expert in both State and Federal court in New York, as well as Connecticut, District of Columbia, and Maryland. (Brewington Decl. **Exh. K**, p. 5).  Mr. Mamet has given sworn testimony in approximately thirty-seven cases in total and has been retained in over two hundred cases regarding law enforcement issues, including additional cases against co-Defendant TASER International. (Brewington Decl. **Exh. L**, Mamet Depo., p. 9: 14-21, p.14: 8-22).   Mr. Mamet has also held positions and taught at the university and college level regarding law enforcement policies and practices, including but not limited to: 1) Assistant Professor, Department of Sociology & Criminal Justice, Saint Francis College, Brooklyn, New York; 2) Adjunct Professor and Guest Lecturer, Criminal Justice Center, John Jay College of Criminal Justice, New York, New York; 3) Faculty Member, Division of Social Studies, Brookdale Community College, Lincroft, New Jersey; 4) General Topics of Security Guard Instructor, State of New York Division of Criminal Justice Services; 5) Guest Lecturer, Criminal Justice Graduate Program, Saint John's University, Queens,

12

New York; and 6) Adjunct Instructor, College Accelerated Program for Police, New York Institute of Technology, Greenvale, NewYork.  (Brewington Decl. **Exh. K**, p.2).  Mr. Mamet also testified that he was current on the literature regarding positional asphyxia.  (Brewington Decl. **Exh. L**, p. 27:8 to 29:20; *see also* Discussion POINT II A(I) *Infra*).

Mr. Mamet's extensive career in the development and review of law enforcement policies and practices, as a trainer of law enforcement officers and working on law enforcement misconduct on a national, state and local level qualify Mr. Mamet as an expert for the purposes of the issues pertaining to law enforcement put forth that resulted in mis-steps that culminated in David Glowczenski's death.  As such, Mr. Mamet is qualified as an expert.

> **B.**  **Dr. Thanning is Qualified As an Expert for the Purposes of Providing Expert Medical Opinions Regarding the Medical Evidence Supporting Excessive Force Used by Defendants and the Mechanisms attributed tothe cause of Death Including Positional Asphyxia and Pepper Spray.**

Dr. Thanning is amply qualified as an expert to determine the cause of injuries and death to David Glowczenski.  Dr. Thanning has over thirty years experience in forensic pathology and is the Director of Forensic Medical Consulting of New York, P.C., a title she has held since 1989.  Some of the positions Dr. Thanning has held include, but are not limited to: 1) Chief Medical Examiner, Office of Chief Medical Examiner (herein "OCME"), Rockland County, New York; 2) Forensic Pathologist Consultant, OCME, Rockland County, New York; 3) Acting Assistant Medical Examiner, Office of the Medical Examiner (herein "OME"), Onondaga County, New York, Locum Tenens Position, in charge of twenty-four hour operation of Medical Examiner's Office; and 4) Deputy Medical Examiner - Forensic Pathologist, OME, Nassau County, New York.  (Brewington Decl. **Exh. M,** p.1)

Dr. Thanning received her medical degree from Medical School, University of Copenhagen, Denmark in 1980 and completed the following specialized medical training in pathology: 1) Resident Physician in Anatomic Pathology, State University of New York at Stony Brook in 1986; and 2) Fellowship in Forensic Pathology, OME, Nassau County, New York in 1987. Dr. Thanning has been board certified by: 1) the American Board of Pathology in anatomic and forensic pathology since June 1993; and 2) American College of Forensic Examiners as a forensic examiner (DACFE) since 1995 and in forensic medicine (DABFM) since September 1995.  In addition to the numerous publications and lectures attributed to Dr. Thanning, she has held over a dozen academic appointments with esteemed institutions including but not limited to Touro International College, American College of Forensic Examiners including appointment as the Chairman, then as Chair Emeritus, and International Society of Police Surgeons and American Academy of Thermology. (*See* **Exh. M** for complete list of publications, academic appointments and lectures).

Dr. Thanning has performed over four thousand autopsies, assisted or supervised in excess of five thousand autopsies, performed several hundred forensic scene investigations involving homicide, accidental, suicidal and natural deaths.  She has testified as an expert in more than four hundred cases at trial and in depositions in approximately eleven states.  (Brewington Decl. **Exh. M**, p. 9).  As such, Dr. Thanning is qualified as an expert in forensic pathology for determining the cause of death of Decedent and the possible source of the injuries he sustained.

Defendants contention that Dr. Thanning's opinions only rest on material provided by Plaintiffs' counsel is misleading, as Dr. Thanning lists the twenty-nine sources she employed which include numerous documents generated by Defendants and co-Defendants, as well as a number of peer reviewed academic papers. (Brewington Decl. **Exh. Q**, p.1-2). The fact that Plaintiffs' counsel

14

provided Dr. Thanning with these initial documents, does not exclude Dr. Thanning as an expert.

Quite tellingly, Defendants fail to cite to why this would be grounds for her exclusion.

More specifically, Dr. Thanning stated in her expert report that her conclusions regarding

mechanism, cause and manner of death were:

> Based upon all of the above, as well as my background, education, training and experience as a Board Certified Diplomate of Anatomic Pathology, Forensic Pathology, Forensic Examination and Forensic Medicine, and furthermore, as former Chair and Chair Emeritus for the American Board of Forensic medicine, Faculty Director of Forensic Examination, Touro College School of Health Sciences, Assistant and deputy Medical Examiner, Currently Chief Medical Examiner of Rockland County Office of the Chief Medical Examiner, a Police Surgeon Life Fellow and Advisory Board Member for the International Society of Police Surgeons, Director of Forensic Medical Consulting, and an Associate Professor of Forensic Examination.

(Brewington Decl. **Exh. Q**, p.7).

Furthermore, Dr. Thanning has professional knowledge through practical experience

regarding law enforcement practices and procedures.  Dr. Thanning has provided formal and

informal training for police officers regarding crime scenes and was deputized as a law enforcement

officer by the sheriff's department in Rockland County between 2003 and 2008. (Brewington Decl.

**Exh.O**, p. 90:3 to 92:3).  Dr. Thanning's former and current list of law enforcement, and

government clients who have hired Dr. Thanning as a forensic pathologist expert consultant include,

but are not limited to:

1. New York City; Patrolmen's Benevolent Association;
2. New York State; Attorney General's Office;
3. New York State; Office of Mental Health;
4. New York State; Nassau County District Attorney's Office, Special Investigations Bureau and County Attorney's Office;
5. New York State, Capital Defender's Office;
6. State of Kansas, Capital Defender's Office;
7. Metropolitan Transportation Authority, Long Island Rail Road;
8. New York State, Indigent Defendants' Legal Panel. Assigned Counsel Plan

      9.     New York State, Onondaga County, District Attorney's Office; and
      10.    Washington, D.C., Attorney General's Office, pro bono for National Disaster Team
               Investigation of major airplane crash, Avianca Airline, January 1990.
(Brewington Decl. **Exh. M**,p.8-9).

As such, Dr. Thanning, as an esteemed forensic pathologist who has performed thousands of autopsies and worked extensively with law enforcement nationally, is qualified for the purposes of her expert testimony provided in her expert medical report regarding the death of David Glowczenski. As such the Court must deny Defendants' motion to exclude Dr. Thanning's testimony.

**II.    MR. MAMET'S AND DR. THANNING'S EXPERT TESTIMONY IS ADMISSIBLE AS IT IS BASED ON RELIABLE DATA, PROFESSIONAL EXPERIENCE, SPECIALIZED KNOWLEDGE AND SOUNDMETHODOLOGY.**

Once a witness is deemed qualified to testify as an expert, the Court must determine whether the proffered testimony is itself admissible. Federal Rule of Evidence 702 governs the admissibility of expert testimony, and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles reliably to the facts of the case.

Fed. R. Evid. 702. The Supreme Court declared the admissibility standard under Rule 702 employs a dual requirement of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In applying this standard, "the district court functions as the

gatekeeper for expert testimony." <u>Raskin</u>, 125 F.3d at 66.

"In <u>Daubert</u>, the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation in the case of a particular scientific technique; and (4) whether the theory or method has been generally accepted by the scientific community." <u>Lidle</u>, 2010 U.S. Dist. LEXIS 67031 at *9-10(*citing* <u>Daubert</u>, 509 U.S. at 593-94).   However, the Court noted that the <u>Fed. R. Evid.</u> 702 admissibility inquiry is "a flexible one." *Id.* at *10 (*citing* <u>Daubert</u>, 509 U.S. at 594). Therefore, "the factors identified in <u>Daubert</u> may or may not be pertinent in assessing reliability, depending on the nature of the case, the expert's particular expertise, and the subject of his testimony." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).  For example, "[e]xpert engineering testimony may rest on scientific foundations or on the personal knowledge or experience of the engineer." <u>Colon ex rel. Molina v. BIC USA, Inc.</u>, 199 F. Supp. 2d 53, 69-70 (S.D.N.Y. 2001); *see also* <u>Donnelly v. Ford Motor Co.</u>, 80 F. Supp. 2d at 45, 48 (E.D.N.Y. 1999)(*noting* that "in certain cases reliability concerns may focus more upon the expert's personal knowledge or experience than on the Daubert factors"). Ultimately, "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." <u>Kumho Tire</u>, 526 U.S. at 153 (*citation omitted*).

"[T]he Second Circuit has found "there should be a presumption of admissibility of evidence." <u>Borawick v. Shay</u>, 68 F.3d 597, 610 (2d Cir. 1995); *see* <u>In re Zyprexa Prods. Liab. Litig.</u>,

489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (noting that "the assumption the court starts with is that a well qualified expert's testimony is admissible");  Fed. R. Evid. 702 advisory comm.'s note (observing that "a review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule").  "Therefore, a trial judge should exclude expert testimony based on reliability concerns only 'if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'"  Lidle, 2010 U.S. Dist. LEXIS 67031 at *11-12 (quoting Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009)(internal quotation omitted).  "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id. (citing also Raskin, 125 F.3d at 66 (noting that "disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve" (internal citation omitted).  The proper course of action, therefore, is "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, [which] are the traditional and appropriate means of attacking shaky but admissible evidence." Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 369 (S.D.N.Y. 2003)(quoting Daubert, 509 U.S. at 596).

### A. Mr. Mamet's Testimony is Admissible as it is Based on in Excess of Forty Years of Practical Experience, Law Enforcement Education, Training of Police Officers and Writing of Law Enforcement Policies, Practices and Procedures.

#### i. Mr. Mamet's Expert Testimony Regarding Positional Asphyxia is Admissible.

Mr. Mamet's testimony reflects an accurate definition and description of positional asphyxia when compared with the definition in peer reviewed articles and by the U.S. Department of Justice

(See discussion POINT II B(I) *Infra*; *see also* **Brewington Decl. Exh. JJ**):

Q:  What is your definition of positional asphyxia?

A:  Positional asphyxia is the situation where a person in a prone position, uhm, usually struggling with police or someone else and pressure is applied to the person's back usually by sitting or standing on the person.

The person's chest is compressed.  The person has difficulty breathing, fights to breathe, tries to get the weight off of them.

And the response by the police or others usually is to apply more pressure because they are dealing with someone who is trying to get them off the back.  And, so it's a cycle.

And then somehow or other the breathing is compromised, and they die. They die not necessarily right away, but they can die a half hour later.

Something happens medically, and they die from it.  Not always, but there have been quite a few deaths.

(Brewington Decl. **Exh. L**, Mamet Depo., p.74:15 to 75:14).

Mr. Mamet's further testimony illustrates his specialized knowledge in the different types of restraint associated with positional asphyxia.  (Brewington Decl. **Exh. L**, Mamet Depo., p. 75:19 to 76:11).  Mr. Mamet's sworn testimony also reflects that he has done a lot of reading on the subject matter and that he has seen the technique in practice, executed by police officers, countless times that in some cases have resulted in death.  (Brewington Decl. **Exh. L**, Mamet Depo., p. 76:19 to 77:24).  Not all of the instances involved the NPD, but a variety of different law enforcement agencies.  (Brewington Decl. **Exh. L**, Mamet Depo., p. 77:21 to 78:15).  Mr. Mamet testified that he has read numerous publications and articles on positional asphyxia, and was able to identify an International Association of Chief of Police (herein "IACP") publication and identified some papers he reviewed by the New York City Medical Examiner's Office at the time of his deposition, but could not remember all of the articles off the top of his head.  (Brewington Decl. **Exh. L**, Mamet Depo., p. 180: 12-25, 185:18 to 186:25).  Mr. Mamet has researched the subject of positional asphyxia,

19

however has not conducted clinical research himself, which is not a requirement under Fed. R. Evid. 702. (See discussion POINT I *Supra*).

Mr. Mamet's opinions regarding positional asphyxia are supported by law enforcement training and warnings against positional asphyxia, which Defendants have failed to show have been discontinued by law enforcement agencies or retracted. (*See* Brewington Decl. **Exh.JJ**; **Exh. LL**). For example, though Defendants seemingly object to the relevance of the experience Mr. Mamet obtained through his work with the NPD and the training video in use since approximately 1993 by the NPD regarding positional asphyxia, Defendants have failed to produce any evidence that law enforcement agencies, like the NPD and the U.S. Justice Department, no longer train or warn law enforcement regarding positional asphyxia.

Defendants raise issue with Mr. Mamet's expert testimony based on genuine issues of material fact which are the province of the jury and are not relevant for the purposes admissibility (*See Supra*). Specifically, concerning if Sgt. Schucht was sitting or standing on Decedent and how much of Sgt. Schucht's approximate 300 pounds of weight was applied to Decedent. The jury can determine those issues of material fact through sworn testimony of the Defendant SVPD Police Officers, witnesses, medical evidence of injury to Decedent. Furthermore, Mr. Mamet clearly states in his expert report:

> Like most cases where I have been retained, in this case there are conflicting versions of the events that took place. I leave these issue to the triers of fact. In providing my opinions, I specifically avoid invading the fact finding province of a jury by resolving any factual discrepancies.
>
> For the purposes of this report my opinions expressed herein are based upon the testimony and reports of the police officers who responded to the scene. The following facts, based primarily on undisputed and dispute deposition testimony, have been considered by me . . .

(Brewington Decl. Decl., Exh.K)

As such, any dispute of fact must be determined by the jury and both Plaintiffs' and Defense Counsel will have ample opportunity to examine and cross-examine Mr. Mamet regarding how his expert opinion may differ if different sets of facts are found by the jury at trial. A supported dispute of a genuine issue of material fact is not grounds to exclude Mr. Mamet's expert opinion. *See* Lidle, 2010 U.S. Dist. LEXIS 67031 at *11-12.

Mr. Mamet's expert testimony is clearly based on his ample law enforcement, training, and teaching experience in addition to his formal education as a law enforcement officer and the numerous law enforcement articles and literature he has read regarding positional asphyxia. As such, Mr. Mamet's expert testimony regarding law enforcement police, procedures, arrest procedures, and practices regarding positional asphyxia are admissible.

ii.    Mr. Mamet's Expert Testimony That Restraints Compromised Resuscitation Efforts is Admissible.

Mr. Mamet's sworn testimony states that his specialized law enforcement training from the NPD and knowledge gained through the New York City training doctrine instruct not to restrain a person in such a way that IVs cannot be inserted into their arm or CPR cannot be administered, such as leaving a person's hands cuffed behind their back as in the case of Decedent. (Brewington Decl. **Exh. L**, Mamet Depo., p. 253:5-25). Additionally, Mr. Mamet testified that in his excess of forty years in law enforcement he has hundreds of experiences dealing with EDPs and medical personnel regarding restraints and that medical personal want patients unrestrained in order to properly administer CPR and insert IVs which is very difficult if a person's hands are restrained behind their back. (Brewington Decl. **Exh. L**, p. 277:7 to 279:25). Mr. Mamet has also been trained, certified

in and performed CPR. (Brewington Decl. **Exh. L**, p. 309: 22 to 310:11). As such, Mr. Mamet applied his specialized training, and professional and experiential knowledge to form his expert opinion that Decedent's hands remaining cuffed behind his back interfered with resuscitation efforts, and is therefore admissible within the context of <u>Fed. R. Evid. 702</u>.

Defendants' contention that Mr. Mamet's expert testimony is not admissible based on any generic police concern that a subject may become violent and therefore want to keep the subject retrained is irrelevant to the life threatening situation involving David Glowczenski. It is undisputed that prior to medical personnel arrival, Defendant SVPD Police Officer Platt observed Decedent in a non-responsive state prior to the arrival of the ambulance. (Brewington Decl. **Exh. X**, Platt Depo., p. 168:3-25). In essence, he was not a threat of any kind. Defendant SVPD Officer Platt's sworn testimony states specifically that prior to the arrival of the ambulance he "observed the color leave" Decedent's face and Decedent was unresponsive. (Brewington Decl. **Exh. X**, Platt Depo., p. 168:14-17). As Decedent was unresponsive, there was no danger to Defendant Police Officers and the restraints from that point onward were entirely unnecessary, as Decedent was not moving and lividity was apparent in Decedent's face. Furthermore, Defendants' citations to Mr. Mamet's testimony that David Glowczenski was reasonably perceived as threat is mis-leading, as Mr. Mamet's testimony was limited to the period of time from when Decedent attempted to get into the Defendant SVPD police car to the period of time when Defendant SVPD Police restrained him. (Brewington Decl. **Exh. L**, Mamet Depo., p. 282:3-22). Similarly, Mr. Mamet stated that he was only an expert on Emotional Disturbed Persons in the context that Defense Counsel was questioning him it terms of being able to recall peer reviewed literature on the spot, in relation to Defense Counsel's questions regarding naming the latest peer reviewed articles on TASER weapons. In no

way was the questioning related to his experience and knowledge for the purposes of <u>Fed. R. Evid.</u> 702. "[T]he Second Circuit has found "there should be a presumption of admissibility of evidence." <u>Borawick v. Shay</u>, 68 F.3d 597, 610 (2d Cir. 1995); <i>see</i> <u>In re Zyprexa Prods. Liab. Litig.</u>, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (noting that "the assumption the court starts with is that a well qualified expert's testimony is admissible").

Furthermore, Defendants contention that Dr. Silberman's affidavit stating that the rear restraints did not impede in any way the treatment of Decedent is erroneous.   Dr. Silberman incorrectly assumed that since the Defendant SVPD Police Officers used two sets of handcuffs on Decedent, Decedent's arms were maintained at his side.  (Brewington Decl. **Exh. MM**, ¶ 9).  Dr. Silberman, who provided no credentials relative to handcuffing,  testified:

> Fourth, the SVVA EMTs properly maintained the patient's hands in handcuffs while performing CPR.  While there is some difference in the deposition testimony as to the number of sets of handcuffs applied to this patient (i.e. either two sets or three), based upon the available testimony of individuals on the scene, at least two set of handcuffs were used during the confrontation between DAVID GLOWCZENSKI and the Southampton Village Police officers.  These two sets of handcuffs were attached to each other in the lumbar region.  Attachment of handcuffs in this manner allows the **arms to be maintained at the patient's side and does not prevent a patient from lying supine, flat on their back, in the optimal position** for effective chest compressions to be performed during CPR.  The use of handcuffs in this manner also avoided impeding transport by maintaining the patient's arms at his sides and preventing the arms from moving about.

(Brewington Decl. **Exh. MM**, ¶ 9, emphasis added).

There is absolutely no evidence on record or in dispute regarding the position Decedent's arms. No less that Dr. Silberman has any basis or knowledge to make his assertions.  After the handcuffs were placed on Decedent, Decedent's hands were always positioned cuffed behind his back until the restraints were removed at the hospital.  (Brewington Decl. **Exh. NN**, Campbell Depo.,

23

p. 37:10-16; **Exh. QQ**; **Exh. PP**, Phillips Depo., p. 23:22 to 24:10; **Exh. OO**).  It is not the province of Dr. Silberman to determine facts, let alone invent facts that are not in evidence.  Dr. Sliberman's opinon regarding the effect of the handcuffs in relation to CPR  attempts is fatally flawed as it is based on facts contrary to those in evidence.  Furthermore, Dr. Silberman opined solely as to the appropriateness of actions of the SVVA EMTs and was not offered as an expert on law enforcement policies and procedures.  (*See* Brewington Decl. **Exh. MM**).

Similarly, Defendants mis-state to Courts findings.   The Court did not find that Defendant SVVA EMTs did not breach emergency medicine protocol, rather that any such breaches did not amount to gross negliegence under the law.  Glowczenski v. TASER International, 2010 U.S. Dist. LEXIS 47127 *11-12.  (That determination is still subject to appeal)

As such, Defendants have not provided any expert testimony to refute Mr. Mamet's expert opinion regarding the failure to remove Decedent's restraints interfered with the resuscitation of Decedent.  In fact Dr. Silberman's affidavit supports that Decedent's hands remaining cuffed behind his back prevented Decedent from being in the optimal position, i.e. his arms by his side, for chest compression and CPR.

As Mr. Mamet's testimony is based on reliable data, expertise and specialized knowledge, it is admissible.

B.        **Dr. Thanning's Testimony is Admissible as it is Based on Decades of Experience as a Forensic Pathologist, Specialized Medical Education, Academic Research and Practical Experience.**

Though Dr. Thanning did not conduct the physical autopsy on David Glowczenski, she based her opinions the two previous autopsy reports, a plethora of documentation listed in her curriculum

24

vita, the autopsy photographs taken of Decedent in conjunction with her expertise and specialized knowledge of forensic pathology and crime scene investigation. (See discussion POINT IB *Supra; See also* Brewington Decl. **Exh. M, O** and **P**).

        i)      <u>Dr. Thanning's Opinion Regarding Evidence of Excessive Application of Force to Decedent is Admissible.</u>

Defendants attempt to exclude Dr. Thanning's expert opinion that "There is evidence of excessive application of force to the decedent," by cherry picking two forms of injuries that were inflicted on David Glowczenski by Defendants, namely: 1) blunt force impacts to the face; 2) neck compressions evidenced by hemorrhages in the bilateral sternocleidomastoid muscles and soft tissues and petechial hemorrhages. However, the list of injuries suffered by Decedent are expansive and clearly provide medical evidence that David Glowczenski was beaten by Defendant SVPD Police Officer, as the medical evidence reveals that Decedent was stomped on, suffered injuries to his testicles, was covered in contusions and suffered multiple internal and external hemorrhages in numerous locations on his body, in addition to the eighteen paired burn marks on his torso. (*See Infra; see also* Brewington Decl. Ech. O, Thanning Depo., p. 125;18 tp 126:20). Said injuries to Decedent listed in Dr. Thanning's Expert Medical Report include, but are not limited to, the following that support the extent of the injuries suffered by David Glowczenski at the hands of Defendant SVPD Officers:

    1.    The autopsy findings evidence multiple blunt force impacts to the face. There are at least 10 separate contusions and abrasions distributed over the cheeks, forehead, nasal bridge and left eyelid, including hemorrhage in the globe of the eye. Because they are distributed over all the possible planes of the face, these can be attributed to a least **10 separate impacts**. It is not possible to say with certainty if these were caused by contact with the ground or if they were inflicted by a fist. However, this distribution is absolutely **inconsistent with simply falling down** with face to the

ground.

2. The neck shows abrasions on both right and left sides, associated with hemorrhages in the bilateral sternocleidomastoid muscles and soft tissues. These may indicate neck compression. The petechial hemorrhages seen, bilaterally, of the eyelids further support **the mechanism of neck compression having been forcefully employed**.

3. Scattered petechial hemorrhages are shown in both right and left lower eyelids. This is a non-specific finding, however, it is usually associated with compromised blood return from the head, and as such, also represents evidence of neck and/or chest compression.

4. Contusions and abrasion to the right chest, associated with fractures of sternochondral junction of right ribs number 4 and 5. Rib factures in this location are highly unusual for a CPR artifact, and may present evidence of **forcible chest compressions**.

5. Fresh hemorrhage of lower abdominal wall. (DCF Photograph #72, Disc 2). **Blunt Force Injury**.

6. Abrasion of right upper back, contusion of left back; 2 inch deep contusion of left upper back; additional evidence of chest compression.

7. Deep hemorrhages of right and left lower back are evidence of **hyperextension of the back**, possibly associated with **wrenching the decedent's arms or upper torso backwards** in pron position (to apply handcuffs).

8. 2 inch hemorrhage surrounding the right testicle (consistent with kicking, pushing etc.).

9. **18 electrical burns, paired** 1.25 to 1.6 inches in maximum distance apart, evidencing at least **9 separate applications** of Taser gun at **extremely close range or probably by directly touching the body**. Description of microscopic sections of some of these lesions describes heat coagulation of the skin. This supports contact application on the Taser.

10. **Seven separate contusions** to left upper extremity.

11. **Ten separate abrasions** and contusions of right upper extremity.

12. Bilateral abraded contusion to the knee.

13. Abrasions and contusions of ankles and dorsal apect of feet, consist with **stomping while supine vs. dragging while prone.**

14. Microscopic examination further documents hemorrhages in scalp, abdominal cavity muscle, and muscles of lower back. (Brewington Decl. **Exh. Q**, p.4-5).


Defendants citations to Dr. Thanning's deposition testimony regarding whether the Defendant

SVPD Officers caused the injuries to Decedent is mis-leading. Dr. Thanning's sworn testimony

26

simply states that she did not see photographs of David Glowczenski prior to his encounter with

Defendant SVPD Officers and therefore cannot testify that Defendants definitely caused the trauma

to Decedent or if he had been injured prior to said encounter.  (Brewington Decl. **Exh. O**, Thanning

Depo., p. 59:2 to 62:25).  There has not been **any** evidence presented by Defendants through sworn

testimony of Defendant SVPD Officers, the Glowczenski family members or any other witnesses

that indicates David Glowczenski's injuries existed prior to his encounter with Defendants on

February 4, 2004.  Defendants' new contention is simply a redherring that is meant to mis-lead and

confuse the Court.  Furthermore, any such contention represents a genuine issue of material fact the

must be decided by the jury and not as a matter of law.  Proponents of expert testimony "do not have

to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts

are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are

reliable. ...  The evidentiary requirement of reliability is lower than the merits standard of

correctness".  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994).

Dr. Thanning's expert opinion regarding the injuries sustained by blunt force to Decedent and

the role the mechanism of neck compressions may have played is based on reliable data and is far

from being so "speculative or conjectural or based on assumptions that are so unrealistic and

contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'"  Lidle,

2010 U.S. Dist. LEXIS 67031 at *11-12 (internal quotation omitted).  "Other contentions that the

assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (*citing also*

Raskin, 125 F.3d at 66 (noting that "disputes as to the validity of the underlying data go to the weight

of the evidence, and are for the fact-finder to resolve" (internal citation omitted))).  Therefore said

expert testimony on blunt force injuries and neck compression suffered by Decedent are admissible

and cannot be excluded.

Similarly, the dispute between Dr. Wilson and Dr. Thanning's expert testimony regarding the mechanism of neck compressions by Defendant SVPD Officers causing the petechial hemorrhages of the eyelids represents a genuine material fact in dispute for the jury to decide. As fact finders it is the role of the jury to weigh the evidence and decide whether Defendant SVPD Officers applied neck compressions to Decedent based on all the evidence in the record and whether Dr. Thanning's expert report based on the medical evidence supports that neck compressions where employed or whether Dr. Wilson's explanation in his autopsy report provides an adequate alternative explanation. As such, disputes between the expert's testimony is not a basis for exclusion of Dr. Thanning's expert testimony under Fed. R. Evid. 702. Furthermore, Dr. Thanning does not opine on whether Defendant SVPD Officers used "excessive force" when used as a term of art in relation to the legal limits of force law enforcement is permitted to use, rather Dr. Thanning's expert opinion states that "excessive applications of force" were used on Decedent based on medical injuries sustained by David Glowczenski. Whether said force was "excessive force" in terms of what a law enforcement officer is permitted under the circumstances that occurred on February 4, 2004, is for a jury to decide.

As such Dr. Thanning's expert testimony regarding the injuries suffered by Decedent, the medical evidence present that supports blunt force trauma and neck compressions in admissible and any genuine issues of material fact regarding when and how the injuries were sustained are for a jury to decide. Defendants' motion to exclude said expert testimony must be denied.

ii)     <u>Dr. Thanning's Expert Testimony Regarding Positional Asphyxia isAdmissible.</u>

It is undisputed that Dr. Thanning testified that she is an expert of positional asphyxia and that she listed positional asphyxia as a contributing factor in David Glowczenski's death. (Brewington Decl. Exh. O, Thanning Depo., p. 137; **Exh. Q**, p.7).  Dr. Thanning's sworn testimony states:

Q:     Are you an expert in positional asphyxia?

A:     I would consider myself, yes, that is very much part of our day-to-day evaluation of injuries as forensic pathologists.

Q:     What research have you done in positional asphyxia?

A:     I have done lots of training and reading and examination and research on positional asphyxia.  It is a frequent issue that comes up and needs evaluation on homicide victims as well as suicide victims and accidental fatalities.

(Brewington Decl. **Exh. O**, Thanning Depo. P. 137:2-15).

Dr. Thanning also testified that she has lectured on positional asphyxia as part of workshops she has lectured and taught at for a number of years in various settings for the American College of Forensic Examiners. (Brewington Decl. **Exh. O**, Thanning Depo., p. 138:6-15).  Dr. Thanning admittedly has not performed any experimental research on living people regarding positional asphyxia, or written any publications, but neither excludes her as an expert or her expert opinion on positional asphyxia. Dr. Thanning has the required personal, professional, practical and specialized knowledge that makes her expert opinion admissible.  Furthermore, the data on which Dr. Thanning relied includes the injuries to Decedent that evidence injuries related to positional asphyxia including but not limited to: neck compressions, blunt force trauma to the head and face, broken ribs from forcible chest compressions, petechial hemorrhages, abdominal hemorrhages and evidence of hyperextention of arms, which is discussed in relation to positional asphyxia *infra*.  (*see also* Discussion POINT II B(I)

29

*Supra*).

Though Dr. Thanning testified that she did not bring any literature on positional asphyxia to her deposition, she testified as follows:

Q:      What does the literature say?

A:      I can't tell you that. I didn't bring any literature with me. I did not research that issue. I'm very familiar with it from a hands-on-prospective when you rear cuff someone, and , thereby, restricting their ability to expand their chest with each breath and moreover put weight on top of their torso forcing their airway, their mouth and nose to the ground. I don't need literature to illustrate how compromising that is to a person's breathing.

(Brewington Decl. **Exh. O**, p. 145: 7-21).

As a pathologist, Dr. Thanning has ample specialized and practical experience in diagnosing positional asphyxia as a cause or contributing factor of death.

Defendants attempt to mis-lead the Court by claiming that positional asphyxia is a theory that has been "debunked." At most, it is an issue that is in dispute, mainly by TASER's paid expert such as Dr. Wetli and Dr. DiMiao who are pushing for the acceptance of "excited delirium" and "exhaustive mania," is a subject of forensic pathology that is disputed amongst credible experts. (*See* Def. Brewington Decl. **Exh. 11**). In fact, the <u>American Journal of Forensic Medicine & Pathology</u> published an article as recently as in its March 2011 Vol. 32 -Issue 1, entitled "An Unsual Accidental Death From Positional Asphyxia," illustrating that positional asphyxia is far from "debunked." (Amer. Jour. of Foren. Med. & Patho. Vol 32, Issue 1, pp. 31-34; *see also* Brewington Decl. **Exh. FF**).

Furthermore, numerous peer reviewed articles exist supporting the existence of positional asphyxia and the combination of the factors that may result in death caused by positional asphyxia,

as Dr. Muara Belviso et.al concluded in a 2003 article published in the <u>American Journal of Forensic Medicine & Pathology</u>:

> To conclude, positional asphyxia as a means of death must be taken into account in case featuring the following conditions: the position of the body must hinder the normal exchange of respiratory gases; there must be a reason why it was impossible to change this position; other causes of natural or violent death must be excluded.
>
> Positional asphyxia can explain the cause of death in various circumstances when autopsy does not reveal significant findings. It must be taken into account not only in suspected cases of death caused by alcohol or drug abuse or in subjects afflicted by psychiatric disease but also in vehicle crashes and accidents at work. Moreover, its occurrence must be considered in persons subjected to torture (inverse suspension) and in some types of surgery (Trendelenburg position).

(Brewington Decl. **Exh. GG**, p. 297).

Dr. Belviso's article lists Drs. DiMaio, Wetli, Neuman, Vilke, and Chan's articles, the expert articles Defendants rely on, into consideration in Dr. Belviso's conclusion that positional asphyxia not only exists, but should be considered more broadly by pathologists. (Brewington Decl. **Exh. GG**, p. 297; *see also* **Exh. FF, GG, JJ** (further peer reviewed article in support of positional asphyxia)). Furthermore, Dr. Belviso's article does not rely on Dr. Reary's study. Furthermore, the 2010 edition of <u>Forensic Sciences</u>, by Dr. Steven Koehler et.al, published by Matthew Bender & Company, Inc., includes a chapter on *Asphyxia: Suffocation, Strangulation and Aspiration*. Said chapter includes a description of positional asphyxia and trauma asphyxia, which cite to a number of peer reviewed articles, including Dr. J.V. DiMaio for the definition of positional asphyxia. (Brewington Decl. **Exh. HH**, p. 5-7). All of these seemed to have escaped Defendants.

Furthermore, Defendants contention that Dr. Reary's change of opinion regarding hog-tying

31

specifically causing positional asphyxia on its own is mis-leading. (*See* Def. Brewington Decl. **Exh. 11C**). Dr. Reary's testimony is that he now agrees that hog-tying on its own, does not create a physiological consequence, however there were a whole set of circumstances, excluding hog-typing that lead to positional asphyxia in the case of Dan Price and Dr. Reary held to his opinion that positional asphyxia was a contributing factor to Mr. Price's death. (Def. Brewington Decl. Exh.11C, p. 24:1 to 25:5). As it is undisputed in this case that Decedent was not hogtied. Dr. Thanning testified that her opinion regarding positional asphyxia as a contributing factor to Decedent's death was based on a myriad of factors including: 1) leaving Decedent face-down; 2) hyperextending him as he was prone on the ground; and 3) the weight of at least one officer on Decedent's back as Decedent was prone and handcuffed, restrained on the ground. (Brewington Decl. **Exh. O**, Thanning Depo., p. 140: 2-25). The definition of positional asphyxia, the broadest sense include modes of asphyxiation by compression of the thorax and/or abdomen, and the mechanisms that contribute to cause death are far more broad than just hog-tying, specifically include neck compressions, as were present in Decedent's autopsy photos . (Brewington Decl. **Exh. GG**, p. 293; **Exh. B**; *See also* discussion POINT II B(i)).

> It is clear, therefore, that positional asphyxia can occur in various ways, some of which are better defined and more easily characterized from a pathophysiologic perspective (such as the head-down position), whereas in others, the forced position of the head, neck, or rib cage in restricted spaces can trigger asphyxiation mechanisms (blocking of the respiratory orifices, atypical compressions of the neck, compressions or immobilization of the thorax). (Brewington Decl. **Exh. GG**, p. 293) ...

> Other factors may also intervene, such as the position of the victim with his or her face on the pavement, possible occlusion of the respiratory orifices and further hindrance of chest movement ... (*Id.* at p. 296).

Furthermore, U.S. Department of Justice , Office of Justice Programs, Nation Institute of Justice, through its National Law Enforcement Technology Center published in its warning to law enforcement regarding positional asphyxia described the following factors: 1) a suspect is restrained in a face-down position, and breathing may become labored; 2) weight is applied to the person's back - the more weight, the more severe the degree of compression; 3) the individual experiences increased difficulty breathing; 4) the natural reaction to oxygen deficiency occurs - the person struggles more violently; and 5) the officer applies more compression to subdue the individual. (Brewington Decl. **Exh. JJ**).

Dr. Thanning's expert opinion that  positional asphyxia contributed to the death of David Glowczenski is based on reliable and scientific data that is far from being so "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'" Lidle, 2010 U.S. Dist. LEXIS 67031 at *11-12 (internal quotation omitted).  At most, there are disputes amongst experts regarding the long established mechanism of positional asphyxia, and as such, it is the province of the jury to hear the expert testimony and weigh the factors to come to a determination.   "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id. (citing also Raskin, 125 F.3d at 66 (noting that "disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve" (internal citation omitted))).   Therefore Dr. Thanning's  expert testimony on positional asphyxia is admissible and cannot be excluded.

iii)     Dr. Thanning's Expert Testimony Regarding Positional Asphyxia is Admissible.

Dr. Thanning has performed over four thousand autopsies, assisted or supervised in excess

of five thousand autopsies, performed several hundred forensic scene investigations involving homicide, accidental, suicidal and natural deaths. She has testified as an expert in more than four hundred cases at trial and in depositions in approximately eleven states. (Brewington Decl. **Exh. M**, p. 9). Dr. Thanning's sworn testimony illustrates that she has specialized knowledge as a forensic pathologist and practical professional experience that makes her qualified as an expert to opine as to the role pepper spray played in Decedent's death:

Q:    You mentioned pepper spray. Are you an expert in pepper spray?

A:    No, I have dealt with cases where pepper spray was considered part and parcel of cause of death and in cases where is was not cause of death. But to make me an individual expert in that particular area, no, I'm not. There are people who are experts in pepper spray exposure.

(Brewington Decl. **Exh. O**, Thanning Depo., p. 130:21 to 131:5).

As illustrated in the above testimony, Defense Counsel's question was very broad, vague and amorphus as to Dr. Thanning's expertise with pepper spray. For example, Dr. Thanning was not questioned regarding whether she was an expert in pepper spray in terms of determining a cause of death. Nor was she questioned regarding how many of the four thousand autopsies she has conducted involved pepper spray. Furthermore, Defendants twist her testimony, as Thanning testified that there was nothing incorrect about the terminology pepper spray and when asked if she was familiar with CS or CN when it comes to chemical irritants, she identified the C as Capsicum. Defense counsel never questioned her regarding the term OC. (Brewington Decl. **Exh. O**, Thanning Depo., p. 131:19-23). Defendants fail to establish how knowledge of all the different terminology for a chemical compound is relevant to determining the mechanism of death. However, Dr. Thanning's sworn testimony establishes that she has practical and professional knowledge and experience with pepper spray for the purposes of admissibility.

34

Dr. Wetli based his determination regarding pepper spray on the crime lab report and not on the hospital records regarding his claim that there was no effect on David Glowczenski. Dr. Wetli further states that he does not know if the body had been washed prior to the autopsy and would have to defer to a toxicologist because he is not an expert on the volatility of OC spray. (Brewington Decl. **Exh. KK**, p. 82:21 to 83:7). Dr. Wetli's determination that positional asphyxia, TASER M26 applications and pepper spray were ruled out by the Medical Examiner as a cause of David Glowczenski's death, afer conspiring with TASER,  only  further evidences that there are genuine issues of material fact in dispute which are the province of the jury and have no bearing on the admissibility of Dr. Thanning's expert testimony.  (*See* Discussions POINT II B (i) & (ii) *Supra*). Additionally, Dr. Wilson's autopsy report was influenced by Dr. Wetli, a paid expert for TASER International and TASER International representatives directly. (Brewington Decl. **Exh. U**, Wilson Depo., p. 36:16: 47:24, 56:9 to 60:25; *see also* Discussion Statement of Facts © *Supra*). Clearly, the protestations of TASER raise nothing but questions about every aspect of their involvement in this case.

Furthermore, the unpublished, non-peer reviewed report that TASER International's CEO, Patrick Smith submits does not refute the expert opinion of Dr. Thanning in any way.  The report clearly states that it is a result of a Federal grant and "This document is a research report submitted **to** the U.S. Department of Justice.  This report has **not been published by the Department**. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice." (Def. Brewington Decl. **Exh. 16I**). Furthermore, the report does acknowledge that deaths and serious harm have been related to pepper spray, albeit rarely. (Def. Brewington Decl. **Exh. 16I**, p. 8-5 ).

It is undisputed that David Glowczenski was subjected to pepper spray.  As such, Dr. Thanning's expert opinion regarding the effects of pepper spray on David Glowczenski are admissible under Fed. R. Evid. 702. It is for the jury to determine the weight of the expert testimony and facts in dispute, such as what effect the exposure to and ingestion of pepper spray had on Decedent and what role it ultimately played in his death at the hands of others.

### III.   MR. MAMET'S AND DR. THANNING'S TESTIMONY IS RELEVANT TO AID THE JURY IN UNDERSTANDING THE MECHANISMS THAT CONTRIBUTED TO DAVID Glowczenski'S DEATH AND THE INSUFFICIENT TRAINING AND INAPPROPRIATE CONDUCT OF DEFENDANT SVPD POLICE OFFICERS THAT CULMINATED IN DAVID GLOWCZENSKI'S DEATH.

The final analysis by the Court is to determine whether an expert's testimony is "relevant to the task at hand"; namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court.  Daubert, 509 U.S. at 592-93; see Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81 (2d Cir. 1997).  "As stated in the Federal Rules of Evidence, evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Lidle, 2010 U.S. Dist. LEXIS 67031 at*12 (quoting Fed. R. Evid. 401). The Daubert court described this consideration as one of "fit," requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury. Id. at *12 (quoting Daubert, 509 U.S. at 591-92).

In order to be relevant, "[e]xpert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons; those can properly be advanced by the parties in their

36

summations." Id. at *13 (quoting In re Zyprexa, 489 F. Supp. 2d at 283).  Neither should it comprise

conclusory testimony that "undertakes to tell the jury what result to reach [or] attempts to substitute

the expert's judgment for the jury's." Id.; also citing United States v. Duncan, 42 F.3d 97, 101 (2d

Cir. 1994) ("In evaluating the admissibility of expert testimony, this Court requires the exclusion of

testimony which states a legal conclusion."). Rather, expert testimony is relevant if it is "likely to

substantially assist the average person in understanding the case--even if it simply explains facts and

evidence already in the record." In re Zyprexa, 489 F. Supp. 2d at 283.

        "We have cautioned, however, that the district  court's Daubert gatekeeping role does not

permit the district court, in ruling on evidentiary sufficiency, to reject admissible expert testimony."

 Amorgianos v. Amtrak, 303 F.3d 256, 267-268 (2d Cir. N.Y. 2002)(See In re Joint E. & S. Dist.

Asbestos Litig., 52 F.3d 1124, 1132-34 (2d Cir. 1995); see also Marbled Murrelet, 83 F.3d at 1066-

67).  "Once the district court has deemed the evidence sufficiently reliable so as to be admissible,

it is 'bound to consider the evidence in the light most favorable to plaintiff' when deciding motions

for summary judgment or judgment as a matter of law." Amorgianos, 303 F.3d at 267-268(citing

In re Joint, 52 F.3d at 1135).

        **A.**    **Mr. Mamet's Testimony is Relevant to Educate the Jury Regarding Long Held**
                **Law Enforcement Policies,  Practices and Training Issues Central to the**
                **Circumstances That Resulted in the Death of David Glowczenski.**

        Mr. Mamet's testimony in policing and police science regarding positional asphyxia will aid

the jury in determining the extent to which law enforcement agencies were aware of positional

asphyxia and if Defendant SVPD's failure to train its Police Officers regarding positional asphyxia

breached widely accepted law enforcement policies, practices and procedures, resulting in liability

37

as a failure to train.  Said testimony will also aid the jury in determining whether a reasonable police officer would have been aware of the dangers of positional asphyxia and whether the actions taken by said Defendant SVPD Police Officers support liability against them as alleged in this lawsuit.

Similarly, Mr. Mamet's testimony regarding Defendants failure to remove the handcuffs from behind Decedent's back and its interference with resuscitation efforts based on his vast experience and interaction with medical personnel, will aid the jury in determining whether Defendants seizure of Mr. Glowczenski breached standard police practices, policies and procedures regarding the refusal to remove said restraint and whether, based on Court instruction,  said inaction equates to liability under the law.

As such, Mr. Mamet's testimony is relevant to aiding the juries understanding of widely accepted law enforcement practices, policies and procedures regarding the aforementioned issues and whether any liability attaches for breaching said law enforcement doctrines.

**B.**      **Dr. Thanning's Testimony is Relevant to Educate the Jury Regarding the Mechanisms that Contributed to David Glowczenski's Death and the Medical Evidence in Support thereof in Terms of Injuries Sustained by the Decedent and said Injuries Relation to Causation of Death.**

Dr. Thanning's expert testimony regarding the injuries sustained by Decedent and the multiple factors that lead to his death are essential to aid the jury in determining the cause and contributing causes to David Glowczenski's death.  Dr. Thanning's expert testimony will also educate the jury on the how the different injuries sustained by Decedent occurred and to provide an realistic and alternate finding to the autopsy report created by Dr. Wilson, which was undeniably influenced by TASER International representatives and  Dr. Wetli who is a paid TASER expert. Defendants will have to anser s to why it was in any way proper for them to consult with each other

38

about the death of David Glowczenski, and how that aided the coverup charged here.   Dr. Thanning's expert opinion will also aid the jury, in conjunction with Mr. Mamet's expert opinion on use of force by law enforcement, as to whether excessive force was used on David Glowczenski by Defendants.

As such, Dr. Thanning's expert report and testimony is relevant to the causation of David Glowczenski's death and must be allowed by the Court.

## CONCLUSION

As demonstrated Supra, Dr. Thanning's and Mr. Mamet's are both qualified as experts and their expert testimony is admissible under Fed. R. Evid. 702.  Defendants' motion to exclude said testimony must be denied.  Defendants request to exclude Dr. Leiken's testimony must be denied as put forth in Plaintiffs' motion in opposition of Defendant Platt's motion to exclude Dr. Leiken's testimony in its entirety.[1]

---

[1]Defendants join co-Defendant Platt's motion to exclude Dr. Leiken's expert testimony in its entirety by incorporation through reference to said motion.  Plaintiffs' respectfully direct the Court to Plaintiffs' response to co-Defendant Platt's motion for the arguments as to the admissibility of said testimony, and the reasoning that the Court should deny the motion to exclude Dr. Leiken's testimony.

Dated: Hempstead, New York
      February 28, 2011

                              Respectfully submitted,

                              LAW OFFICES OF
                              FREDERICK K. BREWINGTON

                        By:

                              FREDERICK K. BREWINGTON
                              *Attorneys for Plaintiffs*
                              556 Peninsula Boulevard
                              Hempstead, New York1 1550
                              (516)) 489-6959

40