UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MARY JANE GLOWCZENSKI, and JEAN GRIFFIN,
Individually and as the Co-Administratrix of the Estate
of DAVID GLOWCZENSKI,

         Plaintiff(s),

   -against-

TASER INTERNATIONAL, INC., OFFICE OF THE SUFFOLK
COUNTY MEDICAL EXAMINER, M.D. JAMES C. WILSON,
VILLAGE OF SOUTHAMPTON, SOUTHAMPTON VILLAGE
POLICE DEPARTMENT, POLICE OFFICER BRIAN PLATT
in his individual and official capacity, POLICE OFFICER
MARLA DONOVAN, in her individualand official capacity,
POLICE OFFICER CHRIS WETTER, in his individual and official
capacity, POLICE OFFICER ARTHUR SCHUCHT, in his individual
and official capacity, COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, LIEUTENANT JACK FITZPATRICK in his
individual and official capacity, LIEUTENANT HOWARD LEWIS,
in his individual and official capacity, and JOHN DOES 1-10,
         Defendant(s).
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**
CV04-4052(WDW)

**APPEARANCES**:
Rutherford & Christie, LLP
Lewis R. Silverman, Esq.
369 Lexington Avenue, 8th Floor
New York, New York 10017
Attorneys for Defendant Brian Platt

Devitt Spellman Barrett, LLP
Diane K. Farrell, Esq.
Jeltje deJong, Esq.
50 Route 11
Smithtown, NY 11787
Attorneys for Village and Police Defendants

Renzulli Law Firm, LLP
Christopher Renzulli, Esq.
John F. Renzulli, Esq.
John Tait, Esq.
81 Main Street, Suite 508
White Plains, NY 10601
Attorneys for Defendant Taser International

Suffolk County Department of Law
Richard T. Dunne, Esq.
H. Lee Dennison Building
100 Veterans Memorial Highway
Hauppauge, NY 11788
Attorneys for the Suffolk County Defendants

Law Offices of Frederick K. Brewington
Frederick K. Brewington, Esq.
50 Clinton Street, Suite 501
Hempstead , NY 11550
Attorneys for Plaintiffs Mary Jane Glowczenski and Jean Griffin

**WALL, Magistrate Judge:**

Before the court are several motions in limine seeking to preclude all or part of the testimony by four experts proffered by the plaintiffs. Oral argument on the motions was heard on March 20, 2012 and rulings were made from the bench. At the oral argument, a ruling on the motions in regard to Dr. Michael Morse was announced, but I agreed to take another look at the papers on those motions. After having done so, I adhere to the ruling announced in court. After the renewed summary judgment motion to be made by defendant Taser International, the defendants can renew their *in limine* motions to preclude if the posture of the case at that time makes such motions viable.

The motions and their dispositions are:

1) DE[161] - the Village Defendants'[1] Motion to preclude all testimony by Dr. Lone Thanning[2], M.D. and Alan M. Leiken, Ph.D, the damages expert, and to limit testimony by Edward Mamet, the police procedure expert: Moot as to Dr. Thanning and denied as to

---

[1]The "Village Defendants" include the Southampton Village Police Department and the individual police officers Marla Donovan, Chris Wetter, Arthur Schucht and Lieutenant Howard Lewis.

[2]Dr. Thanning was the plaintiffs' original cause of death expert. She has been replaced by Dr. William Manion, and the motions as to her are thus moot.

    Dr. Leiken and Mr. Mamet.
2) DE[165] - Taser's motion to preclude testimony about warning and design by Michael Morse, Ph.D., an expert in the field of electricity: Denied.
3) DE[168] - Taser's motion to preclude testimony by Dr. Leiken: Denied.
4) DE[171] - Taser's motion to preclude testimony by Dr. Thanning and Dr. Morse, regarding causation: Moot as to Dr. Thanning, denied as to Dr. Morse.
5) DE[174] - Brian Platt's motion to preclude testimony by Mr. Mamet and Dr. Thanning: Moot as to Dr. Thanning, denied as to Mr. Mamet.
6) DE [197] - the Village Defendants' motion to preclude testimony by Dr. William Manion, the substituted cause of death expert: Granted.
(7) DE[200] Officer Platt's motion to preclude testimony by Dr. Manion: Granted.
(8) DE[205] Taser's motion to preclude testimony by Dr. Manion: Granted.

Based on the rulings from the bench, Taser asked to renew its motion for summary judgment and have a briefing schedule entered. Taser should serve its papers by **April 23, 2012**, the plaintiffs shall respond by **May 14, 2012**, and the reply shall be served and the bundled motion filed by **May 28, 2012**. Extensions to those dates should not be expected, as this nearly eight year old case must move forward and go to trial at the earliest possible date.

## BACKGROUND

The factual background of this action is set forth at length in the Orders deciding prior motions for summary judgment, and will be repeated herein only as necessary. Most of the expert witnesses' testimony, except for Dr. Leiken's, is related to the cause of death of the plaintiffs' precedent, David Glowczenski, on February 4, 2004 and/or the defendants' responsibility for that death. Dr. Leiken's testimony goes to the damages issues. Generally speaking, the plaintiffs allege that Mr. Glowczenski died as a result of excessive force and lack of training on the part of the police defendants, and as a result of the physiologic impact on his body caused by the Taser about which Taser failed to warn the police. The defendants oppose those allegations, and argue that they are not responsible for Glowczenski's death on any of the

theories advanced by the plaintiffs. The particulars of the parties' theories of the cause of death are as follows, based primarily on the most recently filed briefs regarding the Manion motion.

## Theories of the Case and Cause of Death

The cause of Glowczenski's death, according to Dr. Manion, was positional asphyxia augmented by repeated Taser Electronic Control Device ("ECD") discharges causing severe muscle contractions, which increased and accelerated Glowczenski's preexisting metabolic acidosis and contributed to his death. *See* Supp. Jt. Defense (SJD) Ex. 25 at 3; Ex. 26, Manion Dep., 149:19-22, 154:11-17, 225:13-15. Taser argues that the metabolic acidosis theory, that is, that ECD applications cause strong muscle contractions that create lactic acid that affects pH balance and causes sudden death, is entirely dependent on whether the ECD caused significant muscle contractions, which, according to Taser, cannot occur in stun-drive as opposed to probe deployment of the Taser.

The defendants argue that Glowczenski had a long history of mental illness and was off his medications and in a psychotic episode on 2/4/04 during the encounter with the police, who had been called by his mother. When Glowczenski acted aggressively, allegedly knocking a female officer, defendant Officer Donovan, to the ground, Sgt. Schucht told Officer Platt to remove the probe cartridge from his Taser M26 ECD and to drive-stun Glowczenski. Platt applied several ECD drive-stuns to Glowczenski's backside and below his waist, with no apparent effect. The ECD was then abandoned in favor of pepper spray, which was also not effective in calming Glowczenski. Glowczenski was finally restrained, and paramedics were called, as standard procedure following the use of pepper spray. When the paramedics arrived, they found Glowczenski in cardiac arrest, without pulse or respiration, and started resuscitation

measures. Glowczenski's presenting heart rhythm was asystole, not ventricular fibrillation (VF), the expected rhythm from an electrical event. Glowczenski was taken to Southampton Hospital where he was pronounced dead.

The taser used by Platt was tested and, according to the defendants, found to be operating within factory specifications, having been fired four to five times, four times within 39 seconds, on 2/4/04. According to Taser, each ECD trigger pull activates a 5 second cycle, but when in drive stun mode, it delivers an electrical charge only for the time that it is in direct contact with the skin.

Suffolk County Deputy Medical Examiner James Wilson, M.D. did an autopsy and determined the cause of death to be "acute exhaustive mania due to schizophrenia." The death was deemed natural. Dr. Wilson says that "exhaustive mania" and "excited delirium" are basically the same thing, except that "exhaustive mania" involves mental illness and "excited delirium" involves drug use. Both situations allegedly result in a massive overdose of dopamine to the brain. Wilson sent samples of Glowczenski's brain tissue to Deborah Mash, Ph.D for analysis. Dr. Mash, who will be a defense expert, found "a reduction of dopamine transporter sites," typical for dopaminergic overdrive or excited delirium, which Wilson says supports his theory of cause of death. He also testified that individuals with acute, severe psychosis who engage in violent physical activity, like Glowczenski on the day he died, are much more likely to suddenly die than normal people. Wilson did not find the Taser ECD to contribute to Glowczenski's death. In his opinion, nine marks on Glowczenski's skin were consistent with four or five ECD applications based on movement of the ECD caused by Glowczenski's movements, which shifted the Taser. In other words, the defendants argue, nine marks are

5

consistent with only four or five charges because one charge could leave more than one mark.

Taser stresses the importance of understanding the physiological differences between probe deployment and drive stun application.  There is no dispute that Platt used only drive stun applications on Glowczenski.  According to Taser, drive stun application is strictly a pain compliance tool and acidosis theories involving probe-mode deployments, in which the ECD can cause strong muscle contractions, are not transferable to drive stuns, which do not cause muscle contractions.

The plaintiffs say that on 2/4/04 Glowczenski was not violent or threatening to his family and that the police were familiar with him.  The police, they charge, engaged in excessive force that led to Glowczenski's death.  Officer Donovan, they say, lacked training in how to deal with an Emotionally Disturbed Person (EDP) and jumped from her car, but was not pushed down by Glowczenski.  Officers Donovan, Platt, Wetter and Schuct did not have formal training in taking EDPs into custody.  Officer Schuct- 6'2" and 270 lbs. - allegedly knocked Glowczenski to the ground and stayed on his back the whole time.  According to the plaintiffs, Platt shot Glowczenski with the ECD at least nine times in rapid succession, not 4 or 5 times, as the defendants maintain.  Glowczenski was restrained with handcuffs and ankle zip ties, lying face down on the ground.  Plaintiffs say that the data download from the taser was corrupted and that the actual output of the ECD is much higher than Taser claims.

Plaintiffs argue that the theories of exhaustive mania and excited delirium -the official cause of  Glowczenski's death- are vigorously disputed by experts and the theories have been advanced, perhaps manufactured, by Taser to hide the taser's real role in causing death.  The plaintiffs also challenge the accuracy of Taser's testing of its weapons, claiming that the

6

electrical output is much greater than Taser admits and alleging that the test results were corrupted. In making this argument, the plaintiffs rely on the Braidwood Commission Report, with Taser arguing that the study is not admissible and which, in any event, discusses only probe deployments, which are irrelevant here. The plaintiffs also claim "collusion" between Taser and the medical examiner in Dr. Wilson's report on the cause of death.

The plaintiffs argue further that the defendants maintain that Glowczenski was not in pain, but that contention is an issue of fact to be determined by the jury, arguing that Taser weapons in stun drive mode can and do cause intolerable pain. Taser, however, acknowledges that drive stun applications cause pain, describing that mode as a pain compliance tool. The plaintiffs describe Dr. Manion in part as a pain expert, and they and Manion argue that pain in and of itself can indirectly cause muscle contractions. Manion testified that the Taser, in stun drive mode, indirectly caused muscle contractions because of the pain the Taser inflicts. *See* [206] at 19-20. It is unclear the extent to which Manion opines that the muscle contractions caused by pain could have contributed to the death. The plaintiffs also argue, apart from their taser arguments, that the police used excessive force that led to positional asphyxia.

## Daubert and Rule 702 Law

The defendants move pursuant to Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny. Rule 702, which governs the admissibility of expert testimony, provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 "embodies a liberal standard of admissibility for expert opinions . . .." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005). But the Supreme Court has made clear that a district court has a "gatekeeping" function under Rule 702 and must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993). The Supreme Court subsequently "clarified that, whether a witness's area of expertise was technical, scientific, or more generally 'experienced-based,' Rule 702 require[s] the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Nimely*, 414 F.3d at 396 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *see also CDR-Wantagh, Inc. v. Shell Oil Co.*, 2011 WL 795865, *8 (Feb. 28, 2011).

The Second Circuit has articulated four inquiries that a district court must undertake as part of its "gatekeeping" function under Rule 702 to determine whether expert testimony is admissible: (1) whether the "witness is 'qualified as an expert' to testify as to a particular matter," (2) whether "the opinion is based upon reliable data and methodology," (3) whether the expert's testimony on the particular matter is relevant because it will assist the trier of fact; and (4) pursuant to Rule 403 whether the testimony's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely*, 414 F.3d at 397; *see also Deutsch v. Novartis Pharmaceuticals Corp.,* 768 F. Supp. 2d 420 (E.D.N.Y.

2011).

To qualify an expert under Rule 702, the court must be satisfied that "the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 592. "In gauging reliability, the district court should consider the indicia of reliability identified in Rule 702 . . ." *Willis v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). The three indicia of reliability set forth in Rule 702 are not, however, exhaustive. When dealing with challenges to the reliability of scientific evidence, the court must focus on the methodology that the expert used to draw a conclusion and not on the conclusion itself. *See Daubert,* 509 U.S. at 590; *Deutsch,* 768 F. Supp. 2d at 425. Some factors that a court may consider include: (1) whether the expert's conclusions have been tested or are testable; (2) whether the expert's conclusions have been published and subjected to peer review; (3) whether the scientific technique has a potential or known error rate; and (4) whether the expert's conclusions have gained general acceptance within the scientific community. *Deutsch,* 768 F. Supp. 2d at 425.

Additional factors that courts have looked to include: (1) whether the expert is proposing to testify about matters growing directly out of independent research he or she has conducted or whether the opinion was developed expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered. *Id.* (citing *In re Silicone Gel Breast Implant Prods. Liab. Litig.,* 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004)). These factors are helpful but not definitive. The Supreme Court has noted that "the

9

test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis in original); *see also Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002) ("[I]n analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case.")  In *Kumho Tire*, the Supreme Court noted that "some of *Daubert's* questions can help to evaluate the reliability even of experience-based testimony," and that it might be helpful for a trial judge to inquire of the expert whether, for example, the "expert's experience-based methodology has produced erroneous results," or "whether his preparation is of a kind that others in the field would recognize as acceptable." 526 U.S. at 151.

If an expert opinion is based on data, methodology or studies that are "simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Deutsch,* 768 F. Supp. 2d at 426 (internal punctuation and citations omitted).  On the other hand, if an expert "otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony."  *Id.* (citing *Amorgianos,* 303 F.3d at 267).  "'A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Id.*

Ultimately, when determining the reliability of an expert's proffered testimony, the court must "focus on the principles and methodology employed by the expert, without regard to the

10

conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* (citing *Amorgianos,* 303 F.3d at 266). But the Supreme Court has noted that "conclusions and methodology are not entirely distinct from one another," and that a court may conclude "that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner,* 522 U.S. 136 (1997).

Rule 702 codifies a liberal admissibility standard and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Under a liberal qualification standard, a trial court "must consider the totality of a witness's background when evaluating the witness's qualifications to testify as an expert." *Arista Records LLC v. Usenet.com, Inc.* 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009). "In considering a witness's practical experience and educational background as criteria for qualification, the only matter a court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 2006 WL 2128785, *5 (S.D.N.Y. July 28, 2006)(internal citations omitted).

Beyond determining reliability, the court must also determine whether an expert's testimony is relevant to the task at hand, that is, "whether the expert's reasoning or methodology can be properly applied to the facts before the court." *Deutsch,* 768 F. Supp. 2d at 426 (internal citations omitted). Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Court in

11

*Daubert* described the Rule 401 relevance consideration as one of "fit" requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury. 509 U.S. at 591-2.

Here, the defendants argue that the experts are, for varying reasons, lacking in either reliability or relevance or both. The plaintiffs stress the liberal approach and urge cross examination at trial as the best method of testing the experts. With this law in mind, I turn to the motions.

**Dr. William Manion:**

Dr. Manion, a forensic pathologist, is the plaintiffs' second cause of death expert, having been substituted in for Dr. Lone Thanning. There are three motions to preclude his testimony, by Taser (DE[205]), the Police Defendants (DE[197]) and Officer Platt (DE[200]).

<u>The Taser Motion:</u> The Taser motion focuses on Manion's alleged lack of qualifications to testify about the physiological effects of Taser ECD applications on the human body generally or Glowczenski specifically. The other defendants' motions make similar arguments in regard to the taser testimony, but are a bit broader, arguing further that Manion is also unqualified to testify about positional asphyxia. The defendants all join in each other's motions.

Manion is board certified in anatomic, clinical and forensic pathology.[3] He is an assistant medical examiner in two counties in New Jersey and says that he has testified as an expert "probably a hundred times." Dr. Manion opines that Glowczenski's death was caused by "positional asphyxia augmented by repeated TASER [ECD] discharge causing muscle

---

[3]Taser notes that, in this case, Dr. Manion failed to produce his CV, fee schedule and publications list. The information they advance about Manion is taken from the *Hollman* matter. *See* DE[205] at 11, n.2; *see also* note 4, *infra*.

12

contractions" that increased and accelerated Glowczenski's metabolic acidosis, causing him to die in three minutes rather than five minutes. Manion says that "Taser contributed up to 40 percent" to Glowczenski's death. SJD Ex. 25 at 2-3; Ex. 26, 149;19-22, 348:18-20, 225:10-15, 252:12-14, 236:5-6.

Manion has not previously testified in a taser case. His retention in this case and the Hollman[4] case is his first involvement in any Taser ECD related matter. SJD Ex. 28, 42:14-17, 64:15-22. He has also never before testified in a case involving claims of law enforcement positional or restraint asphyxia, but says that he is "an expert in people needing to breathe to stay alive. . . I can just give you common sense." SJD Ex. 26, 147:2-8; 263:2-7; 311:17-25.

Taser argues that Manion is utterly unqualified to testify about the effect of tasers on the human body. Taser says that his opinion about the cause of death "regurgitates, without proper analysis or application to this drive-stun-only case, the now popular metabolic acidosis theory of the plaintiffs' bar that TASER ECD applications allegedly cause strong muscle contractions which may create lactic acid which might affect pH balance and possibly lead to sudden death." Taser objects to Manion's testimony on the ground that he is completely unqualified regarding the effect of tasers on the human body, not even knowing the differences between probe deployment and drive stun applications. The whole metabolic acidosis premise rests on the taser's causing severe muscle contractions, a result that Taser says is impossible with drive stun applications. For the reasons below, I agree that Dr. Manion is not qualified to appear as an

---

[4] Two cases against Taser (*Hollman v. Taser,* CV 06-3588) and Suffolk County police personnel (*Hollman v. Suffolk County,* CV06-3589) are pending before District Judge Bianco, who denied motions to preclude the testimony of experts Manion, Morse and Mamet in those actions. Those rulings are not binding here.

expert about the effect of tasers on the human body or on Mr. Glowczenski or about positional asphyxia.

Manion testified at his deposition that his knowledge about "how a TASER [ECD] works" came from a twenty minute internet search the night before his deposition, during which he read the top ten results that he got. SJD Ex. 26, 116:14-117:10. He also said that he did not have time to read the medical, scientific, electrical and engineering literature on the subject, and his "entire opinion" was based on six documents provided to him by plaintiffs' counsel; he has no knowledge of any articles which support his opinion. SJD. Exs. 25 & 26, 97:22-98:15; 101:25-103:2; 100:10-24; 225:16-226; 287:13-292:13. He testified that he wrote in his report that drive-stun Taser applications would cause muscle contractions because he *thought* that was what was happening, but that he could not, at the time of his deposition, state to a reasonable degree of professional certainty, that a Taser ECD applied to a human in stun drive mode causes muscle contractions. SJD Ex. 26, 112:11-113:2; 122:4-18; 117:18-25. After viewing an exhibit showing the flow of electrical charge from a Taser in drive stun mode, which showed that the charge does not penetrate the dermal fat layer into the skeletal muscle of the recipient, and which Manion agreed was a "fair representation," he was asked if there was anything he wished he had done, or anything that he would inhibit his accurate testimony. SJD Ex. 26, 90:7-18. He answered that he felt "uncertain" about his "theory of all these muscle contractions with the Taser, . . . I wish I had understood better about muscle contractions in the drive stun mode and the effect on the muscle in drive stun mode." SJD Ex. 26, 122:4-18.

Manion also discounted the Suffolk Medical Examiner's cause of death ruling - exhaustive mania- but said at his deposition that he does not know what exhaustive mania is.

SJD Ex. 26, 380:4-22, 382:3-5, 383:7-11. Manion's opinions, Taser argues, are "precisely that pretense of expertise" at which *Daubert* was aimed.

The plaintiffs argue that Taser's assertions about how tasers work are simply wrong. In making that argument, they rely to a marked extent on documents and reports that are, Taser argues, inadmissable hearsay. The plaintiffs don't adequately address the substantive allegations about Manion's lack of preparation or expertise about tasers, noting only his experience as a forensic pathologist generally. They argue that exhaustive mania is a sham idea, but that doesn't address Manion's expertise, or lack thereof, about the matter. If he doesn't know what it is, he can't support their theory of it.

I find that Dr. Manion, while he may be a qualified expert in other cases, is not qualified to testify about the impact of the taser used on Mr. Glowczenski, and that his proposed testimony is inherently unreliable. He does not meet any of the tests suggested in *Daubert* or its progeny, such as *Deutsch,* 2011 WL 790702 at *4. He has inadequate understanding or knowledge about tasers and how they work, specifically about the differences between probe deployment and drive stun modes and the differing impacts those modes have on the human body. The principles and methodology on which his proposed testimony is based are not sufficient for him to qualify as an expert in this area, and his general experience as a forensic pathologist does not change that result. Where an expert opinion is based on data, methodology or studies that are "simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Deutsch,* 2011 WL 790702 at *5. I turn to the arguments that he is also unqualified to testify about positional asphyxia.

Police Motion: The police note that Manion opines that Glowczenski "suffered positional

asphyxia as a result of being rear-handcuffed and having his feet tied, with 'a large police officer' kneeling on his back which prevented the decedent from expanding his chest and breathing." Manion would also testify that Glowczenski's accessory respiratory muscles were compromised by repeated tasering by Officer Platt, causing repeated diffuse contractions, and that the following factors caused respiratory compromise and contributed to the death: (1) being handcuffed in a prone position on the ground, (2) having an officer sit on Glowczenski, and (3) being tasered multiple times to the point of muscular exhaustion with compromise to his accessory respiratory muscles. These opinions, the Police argue, should be excluded because Manion has no expertise as to ECD applications, law enforcement use of force, tools or techniques, and the effects of exertion on metabolic acidosis in the human body, and the opinion is not supported by any admissible evidence in the record or competent medical or scientific evidence.

      The police argue further that Manion did not read any of the police reports in this case and based his conclusions about the "large police officer" on the Complaint. SJD Ex. 26, 142:13-14; 173:22-23; 190:18-19; 347:23-348:20. He did not know the gender of the police officer, how much the large officer weighed or how long he or she was on Glowczenski. SJD Ex. 26, pp. 142-146. Manion did not know how much downward pressure would have been exerted on Glowczenski's back, but said it was "enough." He did not know any peer-reviewed literature that discusses the amount of pressure necessary to cause respiratory compromise, and said the prevailing scientific literature doesn't matter because he was talking common sense. *Id.* at 147:2-8; 33:15-34:16; 36:5-14. He testified that he based his thoughts about the effect of the large police office on common sense, stating that "I'm an expert in people needing to breathe to

16

stay alive. That's all I'm an expert on . . . I can just give you common sense." He agreed that if something is based on common sense, an expert is not needed. *See id.* 263:2-7; 311:17- 312:8.

As to the rear handcuffing, he testified that he could not name any literature that supported his contention that being rear handcuffed would contribute to clinically significant respiratory compromise, but said that he thought being handcuffed would cause more problems for a person than not being handcuffed. *Id.* at pp. 35-36; 330-331. Further, he did not understand that Glowczenski had not been "hogtied," and did not know the meaning of that term. *Id.* at pp. 306-307.

In opposition, the plaintiffs make essentially the same arguments as they do in opposition to Taser's motion, stressing Manion's academic credentials and experience as a forensic pathologist and noting Manion's testimony that there need not be peer-reviewed literature, a learned treatise, or a position statement by a professional organization in order for a forensic pathologist to find his conclusions to a reasonable degree of professional certainty. The plaintiffs also list several scientific articles about positional asphyxia that acknowledge the validity of it as a cause of death, but Manion has not read those articles and they are arguably inadmissible.

In reply, the Police sum up that Manion's opinion is not based on peer-reviewed literature, studies, authoritative texts, his own personal experience as a forensic pathologist or his education, but on the fact that Glowczenski died in police custody after an intense struggle - thus, whatever the police did must have caused his death. The police call this a classic *post hoc, ergo propter hoc* fallacy. Such result oriented reasoning, they argue, does not meet Daubert standards.

Officer Platt's Motion: Like the other defendants, Platt argues that Manion is not an expert on an details of taser use or effect. His deposition testimony amply demonstrated his lack

of even basic knowledge about tasers, let alone the more sophisticated expertise that would be needed for him to qualify as an expert. Platt focuses on Manion's theory that the nine marks on Glowczenski indicates nine trigger pulls, which the defendants say is contradicted by the data from the taser Platt used. The plaintiffs' opposition to Platt's motion is essentially identical to their opposition to the other two motions.

In the reply, Platt argues that to the extent Manion based his opinion - in particular his opinion about the number of trigger pulls as indicated by the number of burns- on some aspect of Dr. Thanning's reports, it should be excluded. They note the plaintiff's argument that the proper course of action for contesting that an expert's assumptions are unfounded is "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," but the defendants will be unable to present evidence of Thanning's lack of understanding and expert knowledge. Dr. Thanning's testimony, they argue, is rank hearsay, inadmissible at trial. Therefore, the court must preclude Manion's testimony based on her testimony about the number of taser applications or any other topic, for that matter.

I agree that Dr. Manion is unqualified to testify as an expert on the topics raised in the police and Platt motions. He was inadequately prepared to discuss these topics with specific reference to Glowczenski, and I find that his proposed testimony is unreliable and unacceptable. The three motions to preclude Manion's testimony are granted.

**Michael Morse, Ph.D., Alan M. Leiken, Ph.D., and Edward Mamet:**

The defendants have also moved to preclude testimony by Michael Morse, Ph.D regarding design defects, failure to warn, and causation; by Alan M. Leiken, Ph.D. regarding damages; and by Edward Mamet regarding police procedures. I have reviewed the arguments for

and against these motions, both on the papers and at the oral argument, and find that although there are weaknesses regarding each expert, those weakness go to the weight of their testimony and the testimony will be allowed. Whatever deficiencies or weaknesses the defendants discern in their testimony can be explored in cross examination. As noted *supra*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Rule 702. Further, the defendants may make renewed *in limine* motions to limit testimony if the outcome of the summary judgment motion makes such motions viable.

Dated: Central Islip, New York  **SO ORDERED:**
       March 22, 2012

                                  /s/ William D. Wall
                                  WILLIAM D. WALL
                                  United States Magistrate Judge