UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JEAN GRIFFIN, Individually and as the
Administratrix of the Estate of
DAVID GLOWCZENSKI,

                                Plaintiff,                04-CV-4052 (SIL)

          -against-

VILLAGE OF SOUTHAMPTON, POLICE
OFFICER MARLA DONOVAN, in her
individual and official capacities, POLICE          **MEMORANDUM**
OFFICER CHRIS WETTER, in his individual       **DECISION AND**
and official capacities, and POLICE OFFICER     **ORDER**
ARHTUR SCHUCT, in his individual and official
capacities,
                               Defendants.
-------------------------------------------------------------------X

**STEVEN I. LOCKE, United States Magistrate Judge:**

      Presently before the Court after a jury verdict in this § 1983 litigation

addressing Plaintiff Jean Griffin's claims of excessive force and failure to intervene

against Defendants Village of Southampton (the "Village"), Police Officers Marla

Donovan and Christopher Wetter and Village Police Sergeant Arthur Schuct,

(together the "Individual Defendants") and failure to train against the Village (with

the Individual Defendants, the "Defendants") is Plaintiff's motion for judgment as a

matter of law, or in the alternative for a new trial, pursuant to Federal Rules of Civil

Procedure 50 and 59. Plaintiff maintains this lawsuit on behalf of her deceased

brother, David Glowczenski, whose interaction with Defendants on February 4, 2004

is what led to the claims in this case.[1]

---

[1] The pretrial litigation of this matter is extensive. Familiarity with all prior proceedings is presumed.
The events relevant to this litigation as documented not only at trial, but throughout the record

## I.    The Evidence at Trial

The credible evidence at trial, which the jury was entitled to reasonably rely upon, and which was largely undisputed, established the following.

David Glowczenski was an emotionally disturbed person suffering from mental illness. *See*, *e.g.*, Trial Transcript ("Tr.") 186, 195-99, 575-77. Signs of his mental illness appeared as early as age 12, when a family court order required him to go to a children's hospital in 1981. Tr. 193-94. David was one of five siblings who, as an adult in 2004, lived in his parents' house where he was raised, on Layton Avenue in Southampton, along with one of his adult brothers, Teddy Glowczenski. Tr. 57-58, 138. Historically, life in the house was sufficiently tumultuous that Teddy would at times stay with his grandmother or in a tent in the backyard. Tr. 77-78, 122, 1029-31. There were multiple sources of difficulty, including David's mental illness, which required that he be institutionalized multiple times throughout his life. Tr. 76, 80, 129 (David was one of several causes of turmoil in the home), 151, 186, 313, 590-91, 597. In certain instances, David had to be taken to these facilities by local law enforcement. Tr. 81-82, 148 (a year earlier, David had to be taken into protective custody by the police), 186. David also had a drinking problem and a history of violence, including violence with family members and police officers. Tr. 112-13, 187-88, 200-02, 597, 895-97. At times, members of his immediate family called the police for assistance and sometimes obtained orders of protection against David. Tr. 97-98, 100, 190 (David's father had David arrested), 611-12 (sister, Jean Griffin, called police

---

involved not just David Glowczenski, but also members of his immediate family with the same surname. Accordingly, the Court refers to David Glowczenksi as "David" within this opinion.

and sought a "refrain-from order"), 619-20, 641-44, *see* Def. Ex. D, Tr. 1028 (sister, Gail, obtained an order of protection against David).

As an adult, David was responsible for taking his medications, though periodically he would stop, at which time he would start hallucinating and hearing voices. Tr. 78-79, 81, 110, 140.

The Individual Defendants who were involved with David Glowczenski on February 4, 2004 were familiar with David and his family and their various problems, including David's mental illness and related issues, as the result of prior interactions with the family. *See, e.g.*, Tr. 96-97, 101-02, 111, 124, 126-27, 185-86, 190 (David had been arrested "many times"), 191-92 (David punched and kicked a Southampton Village police officer), 210-11 (Officer Donovan knew David from prior interactions at his family home and from taking him to psychiatric facilities on several occasions), 225, 295-300, 309, 313, 321, 336-37, 388, 391-92, ("I think pretty much everybody in Southampton was aware [David] had psychiatric issues . . . . When [he was] off his medication, he was prone [to] violent behavior."), 393 (police called because David threatened his brother with a hatchet), 402-03, 428-29, 449-50 (David had been taken into custody before), 513-14 (David had a history of mental health issues, arrests, violence against family members, and having to be transported to psychiatric facilities), 585-87 (Plaintiff Jean Griffin, David's sister, made a complaint about David to the police), 622, 644-46, *see* Def. Ex. E. (police complaint), 892-97, 935, 1030-31, 1034.[2]

---

[2] The Court admitted this evidence solely for the purpose of demonstrating that Defendants were aware of David's mental illness and his history of violent behavior towards others, including police, at

On February 4, 2004, David had stopped taking his medication for fear he would develop diabetes. Tr. 61-62, 113, 140, 580-81. As a result of being off his medication for three days, David began deteriorating, and Teddy and their mother were trying to think of a way to get David to an institution for help. Tr. 62-63, 113-14 (on February 4, 2004, David stated that he was fearful demons would come and destroy the family home), 156. Then at some point that morning, David left the house. Tr. 115-16, 142-43.

At approximately 9:30 a.m., David's mother called the Southampton Village Police Department for 911 assistance, as she had done in the past, and the police came to the house within five minutes and agreed to help. Tr. 115, 142-43, 146, 151-52, 441, 1024-25. By the time they arrived, however, David had returned and the officers left. Tr. 146-48, 395, 442-43. David left the house again shortly thereafter, at which point David's mother called 911 a second time. Tr. 149-51, 447.[3]

After this second 911 call, several police radio calls went out about locating David. Tr. 338. One of the calls advised that David had been seen knocking on a neighbor's window, scaring those in the house. Tr. 338, 395, 900-01.

---

the time of their February 4, 2004 interaction with David. Their knowledge of David's history was part of the circumstances as they understood them at the time of February 4, 2004 and relevant to their decisions concerning how to handle David at each stage of their interaction. In fact, Plaintiff's police expert, David Mamet, testified to the relevance of this information. Tr. 770, 778-82. Accordingly, this information was not admitted for its truth, but rather to explain the Individual Defendants' understanding of the circumstances they were confronting that day, and the jury was instructed accordingly. Tr. 1216-17.

[3] According to David's mother, whose testimony was in the form of a deposition transcript because she passed away prior to trial, she called 911 a second time to say her family would get David to the hospital themselves. Tr. 150-52. This testimony is both illogical and not credible, and the jury was entitled to reject it.

The first officer to locate David was Defendant Marla Donovan. Tr. 213-14. David was near the front of Our Lady of Hamptons School within a five-minute walk from the family home. Tr. 215, 313-14, 340. He was found on the side of the school that had classrooms with windows, and school was in session. Tr. 314, 318.

When Donovan saw David, she was in her police car and David was coming out of some bushes by a residence. Tr. 215. Donovan approached David in the car and did a u-turn, such that David was facing the passenger side door. Tr. 216-17. At first, David attempted to flee, but slowed down when Donovan directed him to. Tr. 217, 293-94. He then attempted to enter the car. Tr. 217. Donovan reported by police radio that she had located David, exited the car, and she and David walked along a sidewalk. Tr. 218-19. At the time, David was gesticulating and in an agitated state. Tr. 223. He was incoherent, talking about Jesus and cursing. Tr. 222, 225. Donovan approached David trying to calm him down. Tr. 223, 294.

The next officer on the scene was Officer Brian Platt, who took over the conversation because he was more familiar with David. Tr. 224-25, 343-44, 396-97, 453, 505, 905. Officer Platt explained to David that his family said he was off his medication and then asked if he and his fellow officers could help. Tr. 344, 396. David responded that he did not want to take the medication because of potential side effects. Tr. 344. Officer Platt offered to take David to the hospital personally, but David refused. Tr. 345, 349.

Then two more officers arrived—Christopher Wetter, followed by Sergeant Arthur Schuct. Tr. 226, 348, 450-51. By this time, David was extremely agitated,

pacing back and forth, approximately 30 feet from the school. Tr. 906, 908. Upon arriving, Sergeant Schuct told David that he wanted to get him help. Tr. 227, 909. At this point, Officer Donovan backed up behind David, and the other three officers were in front of him and off to the side. Tr. 227-28. Then David made a sudden move. According to Officers Donovan and Wetter, he had turned and tried to hit Officer Donovan. Tr. 229, 910, 951-52. Officer Platt and Sergeant Schuct recall this slightly differently, testifying that David attempted to flee, and in doing so put his arm up and into Officer Donovan. Tr. 350, 459-60; *see also* Tr. 909-10 (David "appeared like he was looking for an escape route"). Both Officers Donovan and Platt testified credibly on this point, and the jury could have reasonably believed either testimony.

Sergeant Schuct responded by grabbing David by the wrist or arm. Tr. 229, 350, 456-57, 953.[4] Then Sergeant Schuct grabbed David's collar and swept his legs in order to trip him and force him to the ground. Tr. 466-68. David then fell on top of Donovan. Tr. 230, 910-11. They wound up with David face down and with his legs on top of her. Tr. 233-35, 911. Sergeant Schuct fell as well. Tr. 468. At this point, Donovan was attempting to secure David's hands, while David continued to flail around, kicking, and keeping his arms underneath him. Tr. 234, 351-52, 469, 912-13. This was going on with Sergeant Schuct, who is over six feet two inches and 270 pounds, on David's back. Tr. 235, 352-53, 470, 911. At some point, Officer Wetter, who weighed approximately 170 pounds, was also leaning on David's back while trying to secure his arms. Tr. 944-47, 987-88 (part of Officer Wetter's body was on

---

[4] Sergeant Schuct testified that he put his hand on David's arm and then David made a move toward Officer Donovan, which Sergeant Schuct did not believe was a punch. Tr. 459-61.

David and part on the ground). While the officers were trying to secure David's arms, Officer Wetter saw children's faces in the school windows. Tr. 912. At this point, David was still keeping his hands underneath him, and he had started to push up, with both Sergeant Schuct and Officer Wetter on his back. Tr. 529-30, 914, 948.

Officer Platt withdrew his Taser from its holster, and Sergeant Schuct directed Officer Platt to deploy it in drive stun mode, which Platt did in three of four places. Tr. 236, 351, 354, 357, 471, 476-78, *see* Pl. Ex. 23, Tr. 915-16.

After the Taser proved ineffective in gaining compliance, Officer Wetter deployed OC spray. Tr. 250, 254, 359, 397, 401-02, 481, 916-17. David responded, telling the officers to stop spraying. Tr. 254, 917. After the OC spray was applied, the Individual Defendants were able to get David handcuffed face down. Tr. 258, 917-18. David was still cursing and saying "Jesus" at this time. Tr. 294. According to Sergeant Schuct, the amount of time he was leaning with his weight on David in order to get him cuffed was approximately five minutes. Tr. 482.

Next, Officer Platt obtained packing tape from Officer Donovan to bind David's ankles because even though he was handcuffed, David was still kicking. David broke out of the tape, and eventually zip ties were used to bind David's ankles. Tr. 260, 263, 287, 363-64, 366-67, 496, 919.

An ambulance was then called at Sergeant Schuct's direction. Tr. 266, 269-71, 497, 918. At no point during these events was David compliant with the Individual Defendants' verbal commands. Tr. 318.

Further, after David was restrained, he was beating his head against the pavement. Officers Platt and Wetter both tried to protect against injury by putting a gloved hand between David's head and the pavement. Tr. 397-98, 914-15.[5] After David was cuffed, he rolled over onto his side. Tr. 967-68. Officer Wetter checked and saw that David was breathing, and they spoke. Tr. 980-81, 993. David was also asked whether he wanted to be moved off the ice that was on the ground and onto dry pavement or grass, and David responded affirmatively. Tr. 499. At that point, he was moved to a dry area. Tr. 499-500.

A few minutes later, David was rolled all the way over, and he appeared pale and his lips started to turn blue. Tr. 270, 484 (three or four minutes later, Sergeant Schuct realized that David was not breathing). The Individual Defendants began CPR within the next 15 or 20 seconds. Tr. 272-76, 374-75, 733, 966. Chest compressions, an ambu-bag for breathing and a defibrillator were used. Tr. 272-73. Within a minute and a half of commencing CPR, the ambulance arrived and EMTs continued to administer first aid. Tr. 277, 375, 737. CPR continued in the ambulance, which took David, Officer Donovan and EMT Missy Crooke to Southampton Hospital. Tr. 278. David remained handcuffed and ziptied while CPR was administered, while he was placed in the ambulance and during transport. Tr. 375-77, 502-03, 737, 985-86.

---

[5] Officer Wetter recalls David banging his head on the pavement while David was on the ground but prior to being handcuffed. Tr. 914-15.

## II.     The Verdict

David died on February 4, 2004 shortly after his interaction with the Individual Defendants.  However, as set forth in prior court orders, David's death was not at issue at trial.  *See Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 583-85 (E.D.N.Y. 2013) (dismissing wrongful death claim on summary judgment due to Plaintiff's failure to submit sufficient evidence on cause of death).  Rather, the issues to be resolved at trial all focused on the events of February 4, 2004 prior to David's death.  *See, e.g.*, Tr. 3-4 (explaining to jury that David's death is not part of the case).

Three causes of action were submitted to the jury for consideration:  (1) excessive force against the Individual Defendants; (2) failure to intervene against the Individual Defendants; and (3) failure to train against the Village.  The jury returned a verdict in favor of Plaintiff on the excessive force claim against Sergeant Schuct only, and in favor of Defendants on all other claims.  No damages were awarded, which the Court then modified to one dollar in nominal damages.  DE [346] (Verdict Sheet); Tr. 1254-55; *see also Robinson v. Cattaraugus County*, 147 F.3d 153, 162 (2d Cir. 1998) (court correcting verdict to award nominal damages is appropriate where liability is found but no compensatory damages are awarded); *Ali v. Kipp*, 11-CV-5297 (NGG) (VMS), 2016 WL 7235719 *8 (Dec. 13, 2016) *aff'd* 891 F.3d 59 (2d Cir. 2018).

## III.    Plaintiff's Motion

Plaintiff now moves pursuant to Federal Rules of Civil Procedure 50 and 59 for judgment as a matter of law, or in the alternative for a new trial.  Plaintiff argues that she is entitled to relief because:  (1) the "undisputed evidence demonstrated that

excessive force was used against Mr. Glowczenski" by all of the Individual Defendants; (2) the damages award was contrary to the evidence and the unlawful product of a compromise verdict; and (3) the Village failed to train the Individual Defendants how to interact with emotionally disturbed persons such as David in violation of his constitutional rights. All three arguments fail for the reasons set forth below.

## IV. Analysis

### A. The Standards

Under Rule 50, a court may not grant a motion for judgment as a matter of law "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)); *Houston v. Cotter*, 07-CV-3256 (JFB) (AYS), 2016 WL 1253391 *1 (E.D.N.Y. Mar. 30, 2016). The court may not make credibility determinations or weigh the evidence on a Rule 50 motion. *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289); *Houston*, 2016 WL 1253391 at *1; *Anderson v. Aparicio*, 25 F. Supp.3d 303, 308 (E.D.N.Y. 2014) (quoting *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004) ("the trial court 'cannot set aside the jury's credibility findings and cannot find for the movant based on evidence the jury was entitled to credit'"). Rather, the court must defer to the credibility determinations and inferences that the jury may have drawn in reaching its verdict. *Houston*, 2016 WL 1253391 at *1; *Frank Sloup & Crabs*

*Unlt, LLC v. Loeffler*, 745 F. Supp. 2d 115, 120 (E.D.N.Y. 2010). Accordingly, the motion may be granted only where there is such a total lack of evidence that the verdict could only be the result of conjecture or surmise, or the evidence in favor of the movant is so overwhelming that a fair-minded person could not have returned a verdict against it. *Weather v. City of Mount Vernon*, 474 Fed. App'x 821, 823 (2d Cir. 2012); *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004). The burden on the movant is a "heavy" one. *Ortiz v. City of New York*, 15 CV 2206 (DLC), 2018 WL 1989595, at *6 (S.D.N.Y. Apr. 27, 2018).

Rule 59 provides that a court may grant a new trial in a jury case for any of the reasons "for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59. Accordingly, a new trial may be granted where the jury's verdict is contrary to the weight of the evidence. *DLC Mgt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998); *Crews v. County of Nassau*, 149 F. Supp. 3d 287, 293 (E.D.N.Y. 2015). Unlike under Rule 50, a Rule 59 new trial may be granted even if the verdict is supported by "substantial evidence," and the verdict need not be viewed in the light most favorable to the nonmoving party. *DLC Mgt. Corp.*, 163 F.3d at 134; *Crews*, 149 F. Supp. 3d at 293. Nevertheless, a new trial should not be granted unless the court is convinced that the jury "reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018); *see DLC Mgt. Corp.*, 163 F.3d at 134 ("the court should only grant such a motion when the jury's verdict is egregious [and] should rarely disturb a jury's evaluation of a witness's credibility"); *Crews*, 149 F. Supp. 3d at 293. Further,

where the verdict depended on the credibility of the witnesses, the court should refrain from setting the verdict aside in favor of a new trial. *Crews*, 149 F. Supp. 3d at 293.

## B. Excessive Force & Failure to Intervene

Plaintiff is not entitled to relief on the excessive force or failure to intervene claims. The Fourth Amendment carries with it the right of law enforcement officials to use some degree of force when lawfully detaining an individual.[6] *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). However, the Fourth Amendment is violated if the amount of force used is "'objectively [un]reasonable' in light of the facts and circumstances confronting [the officers]." *Id.* at 397, 109 S. Ct. at 1872; *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015); *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017). This "test of reasonableness" requires the officers to consider whether the individual being detained presents a threat to the safety of the officer or others and whether he is actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872; *Rogoz*, 796 F.3d at 246. Whether the force used is "reasonable" or "excessive" requires a balancing of the nature and quality of the intrusion on Fourth Amendment interests against the

---

[6] The parties do not dispute that David was not arrested for the commission of a crime, but rather was detained pursuant to New York Mental Hygiene Law, Section 9.41, in effect in 2004, which provides that:

> Any peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.

N.Y. Mental Hygiene L. § 9.41 (2004).

government interests at issue. *Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016); *Jackson*, 236 F. Supp. 3d at 661. The inquiry must recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97, 109 S. Ct. at 1872; *Rogoz*, 796 F.3d at 246. The reasonableness determination must be considered from the perspective of the reasonable officer on the scene" at the moment the force was used. *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872; *Rogoz*, 796 F.3d at 246-47. Similarly, liability may attach where an officer observes or has reason to know of the use of excessive force and fails to intervene in circumstances where the officer had a realistic opportunity to intercede and prevent the unlawful use of force from happening. *Jackson*, 236 F. Supp. 3d at 661; *Sanabria v. Tezlof*, 11-CV-6578 (NSR), 2016 WL 4371750 *5 (S.D.N.Y. Aug. 12, 2016).

Plaintiff claims that the jury's verdict was improper with respect to its conclusion that Officers Donovan and Wetter were not liable for the use of excessive force or failing to intervene with respect to Sergeant Schuct's use of excessive force, and she is entitled to judgment in her favor as a matter of law, or at least a new trial on these issues. The Court disagrees.

With respect to Officer Donovan, the only evidence at trial concerning her use of force was her attempt to get handcuffs on David and the use of some kind of tape to bind his legs. The evidence concerning Officer Wetter was that at some point he was on the ground leaning on David's back in order to get David into handcuffs while

David resisted and that he used OC spray to get David to comply with police directives. The jury acted reasonably, based on the totality of the credible evidence submitted at trial, in concluding that this conduct did not rise to the level of excessive force. David Glowczenski had a long history of interactions with the Village of Southampton Police Department, including the Individual Defendants, going back more than ten years. This history included prior arrests, acts of violence, including one attack on a police officer, numerous orders of protection against him obtained by several members of his immediate family and multiple police escorts to psychiatric facilities for treatment. On the day in question, at the request of David's family, the police located him in an agitated state in front of a local grade school that was in session. He refused to comply with the officers' verbal efforts to take him and get him help. Then, when he moved in Officer Donovan's direction, either to strike her or to flee, Sergeant Schuct grabbed David's arm and then his collar, taking him to the ground and landing on top of Officer Donovan. The officers then tried to handcuff David while David was keeping his arms under him to avoid the cuffs, without success. It was only after David was able to resist the officers' efforts to cuff him that Sergeant Schuct authorized the use of the Taser in stun-drive mode, to gain David's compliance. And it was only after the Taser failed that Officer Wetter used the OC spray. Officer Donovan attempted to bind David's legs only because he was still attempting to kick Officer Platt after he had been handcuffed. Considering that these events occurred in a matter of minutes, against an individual with a history of violence against family members and police and were occurring in front of a local

grade school that was in session with children watching, creating a heightened sense of urgency, the jury could reasonably conclude that the force used was not excessive under the circumstances. As a result, neither judgment as a matter of law, nor a trial on this issue is appropriate.

Similarly, the Court concludes that the credible evidence supports the jury's conclusion that neither Donovan nor Wetter failed to intervene with respect to the excessive force applied by Sergeant Schuct. The entire interaction beginning with when the officers located David and then detained him was extremely brief. In fact, Officer Donovan testified that the physical interaction from the moment that Sergeant Schuct first touched David until David was handcuffed and zip ties were applied to his legs was six minutes. Tr. 265. Consistent with Donovan's recollection, Sergeant Schuct testified credibly that the period from when he was on David's back until he was handcuffed was five minutes. Tr. 470-71, 482. And during this window, Officers Donovan and Wetter were actively involved while David resisted—Donovan first being knocked down, then attempting to assist in getting David handcuffed and getting tape to bind David's ankles because he was attempting to kick Officers Platt and Wetter, attempting to get David handcuffed and deploying the OC spray to gain his compliance. Considering the totality of these circumstances, the jury could reasonably conclude that neither Officer Donovan, nor Officer Wetter, failed to intervene.

### C. The Nominal Damages Award & Compromise Verdict

Plaintiff next challenges the nominal damages award based on Sergeant Schuct's use of excessive force as improper because: (a) no amount of force against David Glowczenski was justified, and (b) even if some amount was justified, the verdict was the result of an impermissible compromise. Both arguments fail.

An excessive force finding does not automatically entitle a plaintiff to compensatory damages. *Ali*, 891 F.3d at 65. As the parties agree, in order to recover compensatory damages, a plaintiff must prove the excessive force caused the injuries for which he seeks compensation. *Amato v. City of Saratoga Springs*, 170 F.3d 311, 315-16 (2d Cir. 1999); *Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998).

According to the verdict, Sergeant Schuct applied some amount of excessive force in detaining David, but that force did not result in any compensable injury. Accordingly, the jury awarded zero dollars, which the Court modified to one dollar. This conclusion is consistent with the credible evidence at trial. Reviewing the verdict as a whole, it appears that the jury concluded that Sergeant Schuct's grabbing David by the collar, taking him to the ground and then leaning on him (at six feet, two inches and 270 pounds) for several minutes while getting him handcuffed constituted excessive force, while the use of the Taser, OC spray and ankle bindings did not. In fact, this interpretation of events was endorsed by Plaintiff's police procedure expert, who testified: "Once the sergeant caused the problem, then [David] started to go out of control. That's when you use the Taser. . . . After they lost control of the subject, that's when the Taser should have been deployed." Tr. 752. It was

reasonable for the jury to understand this testimony to mean that Sergeant Schuct acted inappropriately, but after he did, that Officers Donovan and Wetter acted appropriately in their efforts to regain control of the situation and get David cuffed.

Moreover, given that David managed to start a push up with Sergeant Schuct and Officer Wetter on his back, and that the only testimony was that David continued to flail while he was on the ground and Officers Wetter and Platt tried to protect David's face with their hands to prevent a head injury, Plaintiff failed to prove that this excessive force caused a compensable injury by a preponderance of the evidence. *Accord Ali*, 891 F.3d 64-67 (it is appropriate for the District Judge to harmonize the jury's verdict with the evidence in the context of a verdict finding the use of excessive force but awarding only compensatory damages). In fact, it was reasonable to conclude that any injury suffered, other than the Taser marks, was caused by David himself rather than by the Individual Defendants. These conclusions are a reasonable interpretation of the credible evidence, and the Court will not disturb them.

Further, there is insufficient evidence of a compromise verdict to warrant a new trial. In order to conclude that the jury reached an unlawful compromise verdict there must be indicia over and above inadequate damages, such as difficult jury deliberations or a close question of liability. *Diamond D. Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 17 (2d Cir. 1992). Plaintiff has failed to demonstrate such a compromise. The trial lasted ten days, and the jury deliberated for one day. A number of questions were asked during deliberations—none of which indicated that

the jury was having particular difficulty until the ninth question suggesting an impasse. Tr. 1241. In response, the Court gave the jury a modified *Allen* charge with no objection from the parties. Tr. 1241-44. A little over an hour later, the jury returned a verdict. This sequence of events, alone, is insufficient to establish a compromise verdict warranting a new trial. In fact, given the verdict, the Court concludes that at the time of the ninth note, the jury was in disagreement over a single issue—whether Sergeant Schuct's use of excessive force caused a compensable injury. Then, given the *Allen* charge and another hour to discuss it, they came to an unanimous conclusion. An hour was more than enough to address this one issue in a deliberate and purposeful fashion, and there is no indication to the contrary. For both of these reasons, the motion for a new trial based on an inappropriate award of nominal damages is denied.

### D. Failure to Train

The last argument for post-trial relief is the jury's verdict in favor of Defendant Village of Southampton on Plaintiff's failure to train claim. A municipal entity, such as the Village, can be held liable under § 1983 where the constitutional violation alleged was due to a municipal policy or custom. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2038 (1978). The policy or custom need not be codified. *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996). Rather, a claim may exist where the government officials' conduct results in constitutional violations so "persistent and widespread" that they constitute a custom or usage sufficient to establish liability. *Sorlucco v. NYC Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992).

A municipality may also be held liable where it demonstrates a "manifest failure to train, supervise or discipline [its] employees." *Mahan v. City of New York*, No. 00-cv-6645, 2005 WL 1677524, at *3 (E.D.N.Y. July 19, 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436 (1985)). Such manifest failure only constitutes an official policy or custom if it amounts to "deliberate indifference." *See Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal citation omitted). As described by the Supreme Court:

> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when [municipal] policymakers are on actual or constructive notice that a particular omission in their training program causes [municipal] employees to violate citizens' constitutional rights, the [municipal entity] may be deemed deliberately indifferent if the policymakers choose to retain that program.

*Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1360 (2011) (internal citations omitted); *see also Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("We have held that municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*."). As a result, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62, 131 S. Ct. at 1360 (internal citation omitted). Moreover, where a municipal entity has a training program, a plaintiff must identify a specific deficiency in the program that is "'closely related to the ultimate injury,'

such that it 'actually caused' the constitutional deprivation." *Wray*, 490 F.3d at 196 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)); *Crews*, 149 F. Supp. 3d at 295 ("Even assuming *arguendo* that this testimony demonstrated a failure to train employees. . . , the plaintiff also had the burden of proving [by] a preponderance of the evidence that his constitutional injury was caused by that failure to train.").

Here, while there was conflicting evidence on the sufficiency of the Individual Defendants' training as to how to handle interactions with emotionally disturbed persons like David Glowczenski, even if the Court assumes that there was such a failure to train, Plaintiff failed to establish at trial that such a failure was the cause of any compensable injury. Plaintiff's evidence concerning a failure to train came from police procedure expert David Mamet, who testified that the Village did not have an adequate policy on handling interactions with emotionally disturbed persons. Tr. 707-08. He then testified that the interaction with David was mishandled and that Sergeant Schuct caused the problem. Tr. 752. His conclusion however was undermined on cross-examination in several ways such that the jury would have been free to disregard it. After testifying that it would be relevant to know David's history with respect to violence, including against police officers, Tr. 770, 777-79, he then conceded that in compiling his report concluding that there was a failure to train, he did not know of certain instances of prior violence that would have informed how all of the Individual Defendants would have handled David. Mr. Mamet "was aware of prior police contact[,] [but] was not aware of any assault on police officers," and he

did not "recall anything about assaults, but knew there were family problems." Although he was aware of David's criminal history and certain events in David's history, such as instances of psychiatric institutionalization, domestic violence, and siblings taking out orders of protection against him, he "did not feel it was necessary to put in [his] report." Tr. 773-74, 777-79. Similarly, while Mr. Mamet recalled that Sergeant Schuct was on David's back at some point, he did not know for how long and could not recall that even with Sergeant Schuct and Officer Wetter leaning on him, David was still able to do a push up, which would be important to know. Tr. 783-84.

In addition, Mamet gave testimony indicating his bias toward the party who pays him. For his work in this litigation, he was paid $10,000. Tr. 759. He was confronted on cross examination about a similar case in New Jersey, where he testified on behalf of the police rather than the plaintiff, and his conclusion came out in favor of the police. Tr. 818-20.

In light of these various admissions on cross-examination, the jury was free to conclude that Mamet's testimony was not credible and reject his conclusion that the Village unlawfully failed to train the Individual Defendants.

Moreover, even if there was a failure to train, it is worth noting that the jury found that there was no compensable injury. As a result, because the Court has concluded that this result was reasonable and supported by the evidence, even if there was constitutional violation in this regard, it would not impact any damages award. Accordingly, the motion for judgment as a matter of law, or in the alternative for a new trial as to the Village, is also denied.

## V.   Conclusion

For all the foregoing reasons, Plaintiff's motion for judgment as a matter of law, or in the alternative for a new trial, is denied.

Dated:      Central Islip, New York
            April 11, 2019

<u>/s/ Steven I. Locke</u>
STEVEN I. LOCKE
United States Magistrate Judge